906 So.2d 210 (2001)
Bobby BAKER, Jr.
v.
STATE.
CR-95-0292.
Court of Criminal Appeals of Alabama.
January 12, 2001.
Rehearing Denied March 2, 2001.
*221 Bryan S. Blackwell, Dothan; and Pamela R. Scott, Dothan, for appellant.
Bill Pryor, atty. gen.; and Lindy Beale and Paul H. Blackwell, Jr., asst. attys. gen., for appellee.
McMILLAN, Judge
The appellant was indicted for (1) assault in the first degree, a violation of § 13A-6-20, Ala.Code 1975, for shooting Sharion D. Walker, (2) discharging a firearm into an occupied dwelling, see § 13A-11-61, Ala.Code 1975, and (3) capital murder, for intentionally murdering Tracy Baker with a gun in the course of kidnapping her, see § 13A-5-40(a)(1), Ala.Code 1975. The appellant pleaded not guilty and not guilty by reason of mental defect to all three charges; however, he withdrew the plea of not guilty by reason of mental defect before trial. The appellant was found guilty of all three charges and, following a sentencing hearing, the jury, on the capital murder conviction, by a vote of 10-2, returned an advisory verdict of death. Following a separate sentencing hearing and the submission of a presentence report, the trial court sentenced the appellant to death on the capital murder conviction, to life imprisonment for the assault-in-the-first-degree conviction, and to life imprisonment for the discharging-a-firearm-into-a-dwelling conviction.
The trial judge, in his sentencing order, summarized the crime and the appellant's participation in it as follows:
"On October 18, 1991, Bobby Baker, Jr., and Tracy Nesia Wynn were married in Houston County, Alabama. Right after their marriage, and in fact, *222 on November 17, 1993, domestic problems surfaced in their marriage. In every incident reported, and there were at least seven such incidences, Baker was reported to have assaulted his wife, harassed her, on one occasion rammed the car she was riding in, and on another occasion held her against her will for approximately one week.
"On the date of this offense, which was April 5, 1994, Baker and his wife had apparently been separated for some time. Earlier in the day on the date of this offense, Tracy Baker was at a residence on Short Atlanta Street in Dothan with some friends. One of those friends happened to be a male acquaintance who she had been talking with and, apparently, her husband, Bobby Baker, was aware of this. As Baker's wife and these other friends were leaving this residence, Baker became involved in an altercation with this male friend of his wife. According to witness' accounts, Baker assaulted this male and threatened to kill him for his involvement with his wife. However, Baker and this male were separated at that time and both went their separate ways.
"According to statements obtained by police, Ezederick Eady and Bobby Baker were riding around in Baker's car after the altercation. Eady stated that Baker was very upset with his wife and that he made statements indicating that he was going to hurt her and anyone that had been involved with her. While Baker and Eady were riding around, they picked up another friend, Byron Johnson. Statements from Eady and Johnson indicated that Baker was inquiring as to where he could buy a firearm that night. Sometime during the early part of the evening, Baker went to a residence located on Enterprise Street and obtained what was described as a long weapon that was wrapped in some type of cloth.
"Baker, Eady, and Johnson were riding in Baker's car and Eady was driving the vehicle. It was reported that Baker directed Eady to drive this vehicle to the residence of Sharon[[1]] Walker who was a cousin of his wife, Tracy Baker. Eady drove this vehicle to Walker's residence at 727 Hutchins Street in Dothan and Baker exited the vehicle with this firearm. Witness' accounts indicate that Baker approached the residence and became engaged in a conversation with Sharion Walker. Baker was inquiring as to the whereabouts of Tracy, and Sharion Walker kept telling Baker she did not know where she was. Baker made several threats towards Walker if she did not cooperate with him, and when it appeared she was not going to cooperate, he raised what is described as a AK-47 assault rifle towards Walker's residence and fired through the front door. A number of people were in this residence at the time Baker fired through the front door, including Walker's children as well as Tracy Baker. Baker entered the residence after firing through the front door and a short time thereafter found his wife, Tracy, hiding in one of the rooms. He forced her along with Sharion Walker to leave the residence telling them that they were going with him and he was going to talk to his wife. Johnson and Eady, who were waiting in the car, were initially told by Baker to leave and to come back and pick him up later. However, when they heard the shooting they returned to *223 the scene and were waiting for Baker. Baker came to the vehicle with Tracy and Sharion Walker and ordered both of them to get in the vehicle. Tracy Baker kept telling her husband that she was not going with him, and she knew that he was going to kill her if she did. Sharion Walker kept telling Baker that she did not want to leave her children at home alone, and that she did not want to go with him either. However, Baker forced his wife into the vehicle and, at that point, Sharion Walker refused to get into the vehicle. Baker raised the assault rifle and fired what is believed to be two shots at Sharion Walker hitting her in both legs. At that point, Baker got into the backseat of his vehicle with his wife and ordered Eady to drive away.
"Eady drove the vehicle a short distance away to the dead end of Enterprise Street where he stopped the vehicle. Both Johnson and Eady stated that Baker was continuously arguing with his wife and at times pointing the gun in various directions. Baker was telling Tracy during the ride that he was going to kill everyone who ever had anything to do with her. He also stated that all he wanted to do was to talk to her. When the car stopped on Enterprise Street, Baker got out of the car holding the rifle. He ordered Tracy to get out of the car but she refused stating that she knew he was going to kill her. Tracy Baker asked Eady several times to drive off while Baker was outside of the vehicle but he did not do so. When Tracy continued to refuse to exit the vehicle, he pointed the rifle into the car towards Tracy Baker and began firing. The autopsy report reveals that Tracy Baker was hit five times with bullets from the AK-47 assault rifle that Baker was firing in her direction. When Baker began shooting, both Johnson and Eady began running from the vehicle. One round from the assault rifle hit Eady in the chest area and he ran a short distance from the vehicle before he fell down. Residents who live in the area of Enterprise Street and Terrell Street also heard and saw the shooting and police responded to both this scene as well as the shooting of Walker on Hutchins Street. Both Eady and Johnson report seeing Baker flee the scene after the shooting and neither had any further contact with him.
"Police who responded to the scene of the shooting of Sharion Walker on Hutchins Street were advised by Walker that Bobby Baker had been the one who had committed the assault on her and had abducted his wife, Tracy. Police were also dispatched to the scene of the shooting at Enterprise Street and Terrell Street where Tracy Baker had been shot. Police recovered the assault rifle that Baker dropped as he fled the scene of the shooting. A look-out was posted for Baker and it was not until the following day that Baker was located when he turned himself in at the police department.
"On April 6, 1994, at approximately 11:00 a.m., Baker was advised of his rights by police investigators and gave a statement. Initially he stated that he had gone to the house on Hutchins Street and had fired into it with a .22 caliber rifle. He denied any knowledge of a SKS7.62 assault rifle. He also stated that Tracy got into the vehicle of her own free will and it was at that point that he noticed some people coming after them in a white car. He stated that he and Johnson jumped out of the vehicle on Enterprise Street and left Eady and Baker in the car and he denied shooting his wife stating that those people who were following them must have *224 done it. After being confronted with a statement given by Johnson, Baker then advised that he would tell investigators the truth. He stated that Eady and Johnson rented the assault rifle from Donnie Flournoy for $200 worth of base cocaine. He further stated that Eady drove him to Sharion Walker's house where he confronted Walker and then fired the rifle through the storm door demanding to know where his wife was. After finding Tracy in the residence, he says that Tracy got into the vehicle and that after arguing with Sharion Walker, he fired the weapon, but did not know he had hit her. After driving off with his wife in the vehicle, and stopping on Enterprise Street, he stated that he did not mean to kill her but that he shot into the car just trying to scare her. Baker admitted to arguing with his wife, ordering her to get out of the car and also hearing her tell him she would not get in because she knew he was going to kill her. Baker stated that he got out of the car and started shooting. Baker was initially arrested by police and charged with Assault I and Discharging a Gun Into an Occupied Building. Later he was charged with Capital Murder in regards to the shooting of Tracy Baker."

I.
The appellant argues that the trial court erred in denying his request for new counsel, which he made before and during the trial; he especially refers to his allegation that it was the district attorney, rather than defense counsel, who discovered that he was eligible for youthful offender status. In his argument in his brief to this court on this matter, the appellant refers to the fact that he had allegedly seen his counsel only two or three times before trial, which he argues was clearly insufficient for counsel to adequately prepare for trial.
The record indicates that, just before voir dire examination, the appellant moved to have new counsel appointed to represent him, as follows:
"MR. BAKER: Your Honor, I would like two more attorneys on my case.
"THE COURT: Do you want four attorneys?
"MR. BAKER: No. I'm not happy with Mr. Brantley and Mr. Storey.
"THE COURT: Would you like to put on the record why you're not?
"MR. BAKER: Why I'm not? I don't believe they are doing everything to defend me.
"THE COURT: Well, Mr. Baker, that's kind of a general statement. You need to put specifics on the record.
"MR. BAKER: I feel like it's a conflict of interest.
"THE COURT: In what regard?
"MR. BAKER: I don't know.
"THE COURT: Well, you are going to have to tell me some specific details before I can rule on that. You are just giving me generalizations. I don't know what you are talking about. If they failed to do something for you, you need to tell me exactly what it is, so we can put it on the record.
"MR. BAKER: I believe, like I say, they hadn't been over to the jail but two or three times during the whole trialI mean, the whole time I was over there to discuss my case.
"THE COURT: Well, that's one. What's the next?
"MR. BAKER: I don't think I need but one.
"MR. VALESKA: Judge, are there any witnesses or anything else he says shouldn't have been done [sic]?

*225 "THE COURT: Have you given them some witnesses they haven't contacted? As I see the file here, the thing is this thick, two files here with motions. I think your attorneys have done an exceptional job in this case.
"MR. BAKER: I don't think that way.
"MR. VALESKA: Judge, I've got a statement.
"THE COURT: Well, you need to let me know specifically why you feel that way. Unless you give me a good reason, then I can't consider it, because you are not telling me a good reason.
"MR. BAKER: I told you I feel like they ain't doing all they can to represent me in the case.
"THE COURT: Is that your reason?
"MR. BAKER: That's my reason. They haven't been over but two or three times to the jailhouse.
"MR. VALESKA: Judge, we have had numerous hearings in this Court with you, the defendant present, and both those lawyers, at least, two or three times, where we have come in. They have filed thousands, or hundreds, or fifty motions. I've got a signed statement where the defendant says he did it, he wants the electric chair. I don't know what else he wants.
"MR. BAKER: What's that have to do with it? When my lawyers not beenmy objecting to my lawyers about a letter I wrote?
"THE COURT: Okay. I've heard enough. You can sit down.
"MR. BRANTLEY: Judge, can I just briefly respond to what
"THE COURT: Just a minute. Now, I'm going to put this on the record, and I'm going to put it one time. The last time we were in this Court I had to get on you, did I not? I'm giving you a warning. I'm giving you a warning. I don't want any disrespect to the Court at all. Now, I heard what you said when you sat down. I'm giving you a warning, and it will not be given again.
"Now, I think you need to be in the position you need to help your lawyers in this case. First of all, Mr. Ron Storey is an ex-circuit judge, probably one of the best judges we have had in this circuit. And you are saying you don't want him to represent you, or Mr. Brantley, who is a very fine defense attorney, has been practicing criminal defense law for a number of years. And I've already seen the numerous motions they have filed, the numerous hearings we have had in this case, and I think you have gotten as far as what the Court knows and what the Court has seen, as good representation as I have ever seen in a case like this. Okay?
"Now, the trial will proceed. There is no doubt about that.
"MR. BRANTLEY: Judge, I just want to respond [about] allegations I've only been over there to see him two or three times. I've probably seen him at the jail, conservative estimate, twenty or more times since this case started. I saw him yesterday afternoon. I saw him Sunday night at the jail. I saw him Saturday night at the jail for several hours, and I believe I saw him Friday afternoon.
"MR. STOREY: And, for the record, I have seen him one time, which was yesterday, at the jail. I've seen him here at the courthouse. But Mr. Brantley and I made a decision that just one of us would be in communications with Mr. Baker outside the presence of the other."
The appellant also expressed dissatisfaction with his attorneys' performance on a few other occasions during the course of the trial. However, the appellant failed to *226 make any specific allegations in his motion for new counsel or to present any specific evidence to support his motion at any time before or during trial.
"An indigent defendant who cannot afford to retain an attorney has an absolute right to have counsel appointed by the Court in all criminal proceedings in which representation by counsel is constitutionally required. Gideon v. Wainwright, 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799 (1963); Strickland v. State, 280 Ala. 31, 189 So.2d 771 (1965); U.S. Const. amends. V and XIV; Art. I, Ala. Const.1901, § 6; Ala.Code 1975, § 15-12-21; Ala.R.Crim.P. 6.1. While an indigent defendant may have the right to be represented by counsel, he has no absolute right to be represented by any particular counsel or by counsel of his choice. Briggs v. State, 549 So.2d 155 (Ala.Cr.App.1989). The essential aim of the Sixth Amendment is to guarantee an effective advocate, not counsel preferred by the defendant. Wheat v. United States, 486 U.S. 153, 108 S.Ct. 1692, 100 L.Ed.2d 140 (1988). The Sixth Amendment does not guarantee a defendant a meaningful relationship, rapport, or even confidence in court-appointed counsel. Morris v. Slappy, 461 U.S. 1, 103 S.Ct. 1610, 75 L.Ed.2d 610 (1983); Siers v. Ryan, 773 F.2d 37 (3d Cir.1985), cert. denied, 490 U.S. 1025, 109 S.Ct. 1758, 104 L.Ed.2d 194 (1989)."
Snell v. State, 723 So.2d 105, 107 (Ala.Crim.App.1998).
"`[T]he decision whether to remove an appointed counsel and appoint another counsel for defendant is within the sound discretion of the trial court.' Crawford v. State, 479 So.2d 1349, 1355 (Ala.Cr.App.1985). See also, Tudhope v. State, 364 So.2d 708 (Ala.Cr.App.1978).... The right to choose counsel may not be subverted to obstruct the orderly procedure in the court or to interfere with the fair administration of justice. United States v. Sexton, 473 F.2d 512 (5th Cir.1973)."
Briggs v. State, 549 So.2d 155, 160 (Ala.Crim.App.1989).
"In order to prevail on a motion for substitution of counsel, the accused must show a demonstrated conflict of interest or the existence of an irreconcilable conflict so great that it has resulted in a total lack of communication that will prevent the preparation of an adequate defense." Snell v. State, supra, at 107. In Wilson v. State, 753 So.2d 683 (Fla.Dist.Ct.App.2000), a defendant moved to have his counsel dismissed. When asked on what grounds he wished to have his counsel dismissed, the defendant responded that counsel had not conferred with him about the law and that he had lost faith in counsel. The trial court responded that he found defense counsel's performance to have been exemplary; however, "[c]onsistent with his behavior throughout the trial, the defendant refused to remain silent after the trial judge's rulings," supra at 686. The trial court denied the appellant's motion, and the Florida Appellate Court upheld that decision, stating:
"`[T]rial courts are given broad discretion to determine whether a motion to withdraw should be granted.... The primary responsibility of the Court is to facilitate the orderly administration of justice. In making the decision of whether to grant counsel permission to withdraw, the trial court must balance the need for orderly administration of justice with the fact that an irreconcilable conflict exists between counsel and the accused. In doing so, the Court must consider the timing of the motion, the inconvenience to the witnesses, the period of time elapsed between the date of the alleged offense and trial, and the *227 possibility that any new counsel would be confronted with the same conflict. As long as the trial court has a reasonable basis for believing that the attorney-client relation has not deteriorated to a point to where counsel can no longer give effective aid in the fair presentation of a defense, the Court is justified in denying a motion to withdraw. The decision of a trial court to deny a motion to withdraw will not be disturbed absent a clear abuse of discretion.'"
Wilson v. State, 753 So.2d at 688, quoting Sanborn v. State, 474 So.2d 309, 314 (Fla.Dist.Ct.App.1985) (citations omitted).
In the present case, the appellant has made no such showing that a conflict of interest or an irreconcilable conflict exists. Although the appellant alleged that his counsel visited him infrequently, he made no showing of a "total lack of communication," which would have prevented the preparation of a sufficient defense; all the appellant has demonstrated is a possible lack of "a meaningful relationship" or a lack of "confidence in court-appointed counsel," neither of which is guaranteed him under the United States Constitution or Alabama Constitution 1901. Therefore, the trial court did not abuse its discretion by failing to substitute or remove court-appointed counsel and appoint a new counsel for the appellant.

II.
The appellant further argues that the trial court showed a bias against him by joking when discussing the issue of appropriate attire for him at trial, by characterizing his motion as ridiculous, and by refusing to grant mistrials on several occasions during trial. In his reply brief to this court, the appellant also cites an occasion when the trial court threatened to gag the appellant. The appellant argues that the trial court failed to show the appellant and defense counsel proper courtesy and due respect, while it treated the district attorney in a courteous and respectful manner.
The appellant alleges that the trial court first indicated its bias against the appellant during a pretrial hearing at which the appellant made a motion for funds to secure civilian clothing, as well as a motion for an order allowing him to wear civilian clothing in all pretrial and trial proceedings. Defense counsel stated at trial that it was improper to compel the appellant to stand trial dressed in "identifiable jail clothes." The trial court then asked why the appellant had no clothes; defense counsel responded that he was indigent. The appellant stated that his family was unwilling to provide him clothing to wear. The following colloquy then took place among defense counsel, the appellant, the district attorney, and the trial court:
"[DISTRICT ATTORNEY]: Judge, the Salvation Army, any of the churches in town will be more than glad to provide him clothes. That's asking a lot of the taxpayers to pay `x' number of dollars to put him in a suit and tie. They can provide him appropriate clothing through one of the churches or through the Salvation Army. They've done that in many cases in the past. I know the Defense
"THE COURT: Well, now, on the last capital case we had, [defense counsel] were kind enough to go down to the Rescue Mission and spend fifteen dollars out of their own pocket and buy the defendant a nice suit.
"[DEFENSE COUNSEL]: [Cocounsel] and I are not above that, but, we would like for the defendant to be dressed in any
"THE COURT: O.K., I'll grant that to the extent that, if you go to the Dothan *228 Rescue Mission and buy a suit of clothes, not to exceed $25.
"[DEFENSE COUNSEL]: In any proceedings where there might be television coverage or jurors present, we would
"THE COURT: Of course, just a little side to that, after [defense counsel] did that, then, the family went out and bought him some clothes. Of course, I thought the clothes heYou don't have to get the same ones. (Defendant laughing).
"THE COURT: I thought it was rather a good-looking suit myself. Where's he going?
"DEFENDANT: Take me back to the jail.
"THE COURT: Sit down.
"DEFENDANT: Y'all do what you have to do. Take me back to the jail.
"THE COURT: Sit him over there, right now. If you open your mouth one more time you are in contempt of court, do you understand me?
"DEFENDANT: Fuck that.
"THE COURT: What do you want to say to me?
"DEFENDANT: I said fuck that.
"THE COURT: O.K., you are in contempt of court.
"DEFENDANT: You sitting there laughing and, shit, it ain't no laughing matter.
"THE COURT: O.K. Gag him. Go ahead and gag him, right now.
"DEPUTY: I don't have nothing to gag him with.
"THE COURT: Sir?
"DEPUTY: I have nothing to gag him with.
"THE COURT: Well, find something. Nobody comes into this court saying something like that.
"(Whereupon, there was a short break in the proceedings)."
The record indicates that when the proceedings recommenced, defense counsel stated that the appellant had decided he would like to remain; the appellant then apologized to the trial court. The trial court accepted the appellant's apology and also stated that the Court did not "take this lightly" and was aware that "it's very serious." The trial court further stated to the appellant that "most of the motions that've been granted here today, have been in your favor. Do you understand that? And don't think the Court doesn't take this serious, because I do." Thereafter, the proceedings continued.
Subsequently, during trial, after the jury had been excused at the close of the day, defense counsel made a motion for a mistrial on grounds that the appellant had not been present during certain trial proceedings. The trial court then asked defense counsel which proceedings he was referring to, and the following transpired:
"[DEFENSE COUNSEL]: Well, I was going to put that on the record. The jury was placed in the box, and a witness was placed on the witness stand. That witness was
"THE COURT: Well, [defense counsel] I know you have to say this, if your client wants to say that. But there was no testimony taken whatsoever at that time. In fact, the Court was very conscience [sic] of that and made every attempt there would be nothing taking place in this courtroom until your client got back from the bathroom.
"[DISTRICT ATTORNEY]: Let's put something else on the record, [defense counsel]
"[DEFENSE COUNSEL]: I'm not through with my motion.
"THE COURT: What else?

*229 "[DEFENSE COUNSEL]: So, at any rate, I believe the witness was on the stand for approximately four minutes with the jury in the box.
"THE COURT: No, he was not there four minutes. I beg to differ with you about that.
"[DEFENSE COUNSEL]: And then Mr. Baker was then escorted into the courtroom. And for that reason, I'd move for a mistrial.
"THE COURT: Well, that's about the most ridiculous motion I ever heard in my life. Denied.
"[DISTRICT ATTORNEY]: Judge, first let the record reflect [defense cocounsel], one of cocounsel and you had a conversation about not going forward with any testimony because the witness was sitting there. And not one shred of testimony went on as he waited for the defendant to go to the bathroom. No questions were asked, and you and [defense cocounsel] discussed that and had conversations. So, once again, you've got two lawyers who's talking here?
"THE COURT: Well, that's what I am saying. It's kind of ridiculous, isn't it? O.K."
Thereafter, the court was in recess.
On another occasion during the trial, the proceedings were recessed for lunch and, before allowing the jury to reenter the courtroom, the court conducted the following proceedings outside the presence of the jury:
"[DISTRICT ATTORNEY]: Judge, I was out in the hall when I came back from lunch, and Baker starts shooting his mouth off at me and calling me a punk and making remarks about me and you. This is the second time this week he's made remarks to me and I'm not going to keep taking his mouth or his lip. With all due respect, I've said nothing to him, and the next time he pops off, I'm going to say something back to him. I don't have to put up with his mouth. I've said nothing to him in the hall. I merely walked down the hall. And then when other people come in the hall, he ducks behind things so no one can see him. I've told his lawyers what he said to me. And as an officer of the Court, I don't have to listen to his mouth, and I'm getting tired of it.
"THE COURT: Where was he?
"[DISTRICT ATTORNEY]: He was in the cage, and I was right there by this door. He says, `Hey, punk, you.' Then he makes disparaging remarks about you and me. He just said something about the judge and the D.A., something to the affect [sic]. He starts mumbling. I couldn't hear it. And this is the second time he's made remarks to me. And with all due respect, I don't have to listen to his mouth. And I'm not going to do it anymore.
"THE COURT: Well, I'm not either. If you happen to recognize what he says as far as the Court is concerned, let me know.
"[DISTRICT ATTORNEY]: Judge, I can't tell you as an officer of the Court, I can't tell you exactly what he said about you. He mentioned me as the D.A. and you as the judge, but I cannot tell you what he said about you because he mumbled and then jumped behind the thing. I'm saying it's the second time toward me. I've told [defense counsel] on both occasions, and I am going to say something back to him.
"[DEFENSE COUNSEL]: Judge, for the record let me say that [district attorney] has complained to me about that, I have approached my client and made inquiries as to why he made those statements. At each time he denied having made any statement to the D.A.

*230 "THE COURT: Well, the Court will take appropriate action if I ever find out he said anything about me. I've already warned him one time, and I will say at this time I think it would be in your client's best interests to be as courteous to everybody in this courtroom as he can.
"[DEFENSE COUNSEL]: I agree.
"THE COURT: And if he don't realize that, thenwell, he needs to realize that. And I will take appropriate action, whatever it takes. But I won't tolerate anything like that.
"[DEFENSE COUNSEL]: Judge, if [the district attorney]
"THE COURT: In fact, if it does, in fact, keep up to the extent I know what is said, I'll just institute a gag order in this case. And if he wants to sit over there with something on his mouth the whole time, fine, that's all right with me. Did you hear that, Mr. Baker?
(No response.)
"THE COURT: Mr. Baker, I'm addressing you in this Court you answer to me. Do you understand? Did you hear that?
"MR. BAKER: I heard what you said.
"THE COURT: Yes, sir, do you understand what I said?
"MR. BAKER: I heard what you said.
"THE COURT: No, sir, did you understand what I said?
"MR. BAKER: No, sir.
"THE COURT: Okay. Okay. I'll just say this, any outbursts in this courtroom, any words disparaging to the respect of this courtroom to the Court, to the District Attorney, anybody in this courtroom that's part of these proceedings, if the defendant makes one word out of his mouth, there will be a gag order instituted in this case. Right. Period. And that means, Mr. Baker, that your mouth will be gagged. Do you understand that?
"MR. BAKER: No, sir.
"THE COURT: Okay.
"[DEFENSE COUNSEL]: Your Honor, in the event that [the district attorney] hears him say something, rather than [the district attorney's] responding to it, I would hope that he would report it to you, so that we don't have a scene take place in front of the jury room.
"[DISTRICT ATTORNEY]: Judge, with all due respect, this would be the third time.
"THE COURT: In front of the jury?
"[DEFENSE COUNSEL]: In front of the jury room. The cage is right next door to the jury room.
"THE COURT: Well, I don't think the jury knows anything about that.
"[DEFENSE COUNSEL]: But if there is hollering back and forth between Mr. Baker and [the district attorney] they would know that.
"[DISTRICT ATTORNEY]: With all due respect, Judge, if Baker would keep his mouth shut, then there won't be any hollering.
"THE COURT: Bring the jury in and let's get started."
The appellant argues that these instances indicate bias by the trial court against him, because, he says, the trial court's actions and comments indicated a failure to appreciate, or to give deference to, the seriousness of this case. However, the appellant failed to raise the issue of bias or judicial misconduct on this ground at trial; therefore, any error must amount to plain error. Rule 45A, Ala.R.App.P. Although the failure to object at trial does not prohibit review on appeal where the case involves the death penalty, such a failure weighs against any claim of prejudice. *231 Kuenzel v. State, 577 So.2d 474, 489 (Ala.Crim.App.1990), aff'd, 577 So.2d 531 (Ala.1991), cert. denied, 502 U.S. 886, 112 S.Ct. 242, 116 L.Ed.2d 197 (1991). Moreover, each instance the appellant cites as being improper conduct occurred outside the hearing of the jury and, therefore, could not possibly have unduly influenced the jury. See Oglen v. State, 440 So.2d 1172, 1174 (Ala.Crim.App.1983), cert. denied, 440 So.2d 1177 (Ala.1983).
As to the appellant's claim of bias by the trial court as shown in comments he made regarding the appellant's request for funds for civilian clothing for the trial, the trial court was clearly referring to the particular clothing acquired by another defendant in another case; moreover, again, the statements were not made in front of a jury. Although the appellant may have perceived these comments as improperly light-hearted given the seriousness of the proceeding, there is no indication that the trial court was biased against the appellant or that it failed to recognize the gravity of the situation.
"The trial judge has a duty to be thorough, courteous, patient, punctual, just and impartial. Yet, at the same time it must be remembered that he is a `human being, not an automaton or a robot' Allen v. State, 290 Ala. 339, 342, 276 So.2d 583 (Ala.1973). In light of all the circumstances of this case, we find that the actions and comments of the trial judge were not so prejudicial as to require a mistrial or cause a reversal of this conviction."
Oglen v. State, 440 So.2d at 1176. Despite the great deal of care and caution a trial judge must exercise in discharging his duties, "`he is not required to be a "Great Stone Face" which shows no reaction to anything that happens in his courtroom. Allen v. State, 290 Ala. 339, 276 So.2d 583 (1973).' Gwin v. State, 425 So.2d 500, 506-07 (Ala.Cr.App.1982), cert. quashed, 425 So.2d 510 (Ala.1983)." Arnold v. State, 601 So.2d 145, 153 (Ala.Crim.App.1992). The record reveals no bias by the trial court during this discourse.
The appellant's claim that the trial court also demonstrated his bias by threatening to gag the appellant is also without merit in light of the total circumstances of the appellant's conduct and the comments that precipitated the trial court's threat.
"It is essential to the proper administration of criminal justice that dignity, order, and decorum be the hallmarks of all court proceedings in our country. The flagrant disregard in the courtroom of elementary standards of proper conduct should not and cannot be tolerated. We believe trial judges confronted with disruptive, contumacious, stubbornly defiant defendants must be given sufficient discretion to meet the circumstances of each case. No one formula for maintaining the appropriate courtroom atmosphere will be best in all situations. We think there are at least three constitutionally permissible ways for a trial judge to handle an obstreperous defendant...: (1) bind and gag him, thereby keeping him present; (2) cite him for contempt; (3) take him out of the courtroom until he promises to conduct himself properly."
Illinois v. Allen, 397 U.S. 337, 343-44, 90 S.Ct. 1057, 25 L.Ed.2d 353 (1970).
In Illinois v. Allen, the trial judge had removed the defendant from the courtroom after repeated warnings concerning his unruly conduct. The United States Supreme Court wrote:
"... [O]ur courts, palladiums of liberty as they are, cannot be treated disrespectfully with impunity. Nor can the accused be permitted by his disruptive conduct indefinitely to avoid being tried *232 on the charges brought against him. It would degrade our country and our judicial system to permit our courts to be bullied, insulted, and humiliated and their orderly progress thwarted and obstructed by defendants brought before them and charged with crimes.... Being manned by humans, the Courts are not perfect and are bound to make some errors. But, if our courts are to remain what the Founders intended, the citadels of justice, their proceedings cannot and must not be infected with the sort of scurrilous, abusive language and conduct paraded before the ... trial judge in this case."
397 U.S. 337, 346-347, 90 S.Ct. 1057, 25 L.Ed.2d 353.
Rule 9.2, Ala.R.Crim.P., addresses the effect of a defendant's disruptive behavior during a trial in Alabama. That rule provides:
"If a defendant engages in disruptive or disorderly conduct so that the trial or other proceeding cannot be carried on in an orderly manner, the court, after having warned the defendant of the consequences of such conduct, may, if such conduct continues, order the defendant to be bound and gagged, or otherwise restrained or removed from the trial or proceeding. If the defendant continues such disruptive or disorderly conduct after warning, he shall be deemed to have forfeited the right to be present at the trial or proceeding."
The Committee Comments to Rule 9.2 state that there is a preference for removing the defendant from the courtroom, rather than allowing him to remain, bound and gagged. "However, there may be an instance in which binding and gagging is the only method available to the court for dealing with a disruptive defendant, such as where the defendant is charged with a capital offense and sentence is being imposed or where the defendant is representing himself or herself." The present case, involving a capital offense with the possibility of the death sentence, required the appellant's presence during the proceedings. See Wilson v. State, 753 So.2d at 688 (wherein it was held that the trial judge availed herself of one of the "constitutionally permissible alternatives of dealing with a disruptive defendant by gagging him where the judges' decision to [gag the defendant], due to the obvious fear that violence might ensure, is understandable").
In a similar case, the Alabama Supreme Court affirmed a trial court's actions in removing a disruptive capital defendant from the proceedings where he refused to conduct himself in an orderly manner. Ex parte Clemons, 720 So.2d 985 (Ala.1998). In Clemons, the appellant had been repeatedly warned by the trial court that, if he failed to cease his disruptive behavior, he would be gagged or removed from the courtroom; however, the defendant continued his disorderly conduct. The Alabama Supreme Court noted that the defendant's continued disruptiveness and his repeated ignoring of the trial court's warnings indicated his apparent attempt to force a mistrial. The Court held that, under the circumstances of that case, despite the gravity of the capital offense and the potential death sentence, the trial court's removal of the defendant based on his unruly conduct was proper. In the present case, given the totality of the circumstances and the appellant's continued disruptive behavior (his attempting to walk out of the courtroom and his abusive language), as well as the repeated disparaging remarks that he made during recesses toward the court and prosecutor, the trial court's threats were warranted and proper.
"We find no cause for criticism in the judge's conduct and remarks. See generally *233 Oglen v. State, 440 So.2d 1172 (Ala.Cr.App.), cert. denied, Ex parte Oglen, 440 So.2d 1177 (Ala.1983). The record fully supports his indignation over [the defendant's] conduct."
Airhart v. State, 477 So.2d 976, 979 (Ala.Crim.App.1984), reversed on other grounds, 477 So.2d 979 (Ala.1985).
The appellant's final piece of evidence of the trial court's alleged bias against him is the trial court's reference to defense counsel's motion for a mistrial, based on the fact that the appellant was absent from the proceedings when he used the restroom, as "ridiculous." This comment does not amount to plain error.
"A trial judge is not `a mere moderator' of a trial. Sprinkle v. State, 368 So.2d 554, 562 (Ala.Cr.App.1978), cert. quashed, 368 So.2d 565 (Ala.1979) ... In discharging his responsibilities, the trial judge may `properly caution, correct, advise, admonish, and, to a certain extent criticize counsel during the case, provided it is done in such a manner as not to subject counsel to contempt or ridicule, or to prejudice accused in the minds of the jurors,' 23 C.J.S. Criminal Law § 1182 (1989) `trial judge who uses language which tends to bring an attorney into contempt before the jury, or makes any intimation which tends to prejudice the attorney, commits reversible error.' Gwin v. State, 425 So.2d [500, 507 (Ala.Crim.App.1982), cert. quashed, 425 So.2d 510 (Ala.1983)]."
Arnold v. State, supra, 601 So.2d at 153 (this Court found no prejudice caused by a trial court's statement in sustaining the prosecutor's objection to defense counsel's questioning of a witness, that "if I call you down again, there will be a day of reckoning at the conclusion of this trial"), citing Sanders v. State, 426 So.2d 497, 503, 506 (Ala.Crim.App.1982) (no bias or prejudice in the trial court's statements made in sustaining the prosecutor's objections to the defense counsel's questioning that "I am telling you now to shut up about this marijuana business or I will put you in contempt" and "[w]hen I tell you to quit talking about this witness having smoked marijuana I mean it"). See also Hope v. State, 390 So.2d 1077, 1082 (Ala.Crim.App.), cert. denied, 390 So.2d 1083 (Ala.1980) (no bias or prejudice in the trial court's comments to defense counsel that the witness "was not a hostile witness and the Court is not going to permit you to cross-examine this witness and get all that [gobbledy]gook before the jury" and "your last question was [gobbledy]gook and, in the judgment of the Court, intended nothing but to confuse the jury").
In the present case, while the trial court's characterization of defense counsel's motion for a mistrial as "ridiculous" was unfortunate, the jury was not present to hear the comment and the appellant did not object to the trial court's choice of words. The record indicates that the trial court had previously stopped the proceedings, except to allow a witness who had been placed on the stand to be sworn, so that the appellant could use the restroom. The appellant had consented; no testimony was taken before the appellant returned to the courtroom. The record further indicates that there had been some discussion concerning this course of events in order to ensure that the appellant acquiesced. Therefore, defense counsel's motion for a mistrial based on this absence, during which no evidence was presented and no testimony was taken, apparently exasperated the trial court.
"`Occurrences of this character ... are very regrettable and are to be deplored. They could be obviated if all those connected with the trial would be careful to accord to every one, also so connected, the high degree of courtesy and respect *234 expected, or desired, or demanded by himself. An attorney at law is an officer of the court, and as such is under the duty to deport himself with dignity and circumspection, and upon all occasions to manifest and exhibit a marked respect for the court in which he practices, and for the judge thereof, as well as for all officers of the court, parties and the witnesses, and for the juries in attendance.'"
Arnold v. State, supra, 601 So.2d at 153-54. See State v. Brown, 694 So.2d 435, (La.Ct.App.1997) (the trial court denied the defendant's motion for a mistrial based on timeliness, stating "I heard no objection yesterday when that was said by me and it would be ridiculous after selecting a jury and hearing this lady's testimony to now ask for the mistrial"); People v. Terrell, 185 Ill.2d 467, 708 N.E.2d 309, 236 Ill.Dec. 723 (1998) (no prejudice in the trial court's typifying certain questions to the venire concerning whether the members would automatically vote to impose the death penalty as "silly" and "repetitious"); People v. Nelson, 206 Ill.App.3d 956, 967, 156 Ill.Dec. 899, 571 N.E.2d 879 (1991) (no bias from the trial court's comment in reference to the defendant's claim of ineffective assistance of counsel, that it was appointing new counsel for the defendant because of a "`very ridiculous appellate court case'"); People v. Dixon, 184 Ill.App.3d 90, 100, 539 N.E.2d 1383, 1390, 132 Ill.Dec. 577, 584 (1989) (no prejudice in the trial court's reference to the "somewhat bizarre concepts of defense" and the statement that "if Defendant Dixon wants to pursue these pipe dreams individually, I will consider severance ...." because, although the remarks were unfortunate or ill-advised, they did not constitute plain error, in the context of the entire trial); Smith v. State, 308 Ark. 603, 605, 826 S.W.2d 256, 257 (1992) (no reversible error was found by a trial court's comments made outside the hearing of the jury, despite the defendant's claims of overt bias by the trial court against the defense counsel, where the circuit court "called the appellant's motions `ridiculous' and `bureaucratic nonsense'").
Although certain remarks by the trial court in this case were regrettable, none of those remarks, which were made outside the hearing the jury, constituted plain error, i.e., affected the appellant's substantial rights. Rule 45A, Ala.R.App.P.
"In McNeely v. State, 524 So.2d 375 (Ala.Cr.App.1986), this court held:
"`"Each case of allegedly improper remarks by a trial judge must be judged on its own peculiar facts. Oglen v. State, 440 So.2d 1172, 1175-76 (Ala.Cr.App.), cert. denied, Ex parte Oglen, 440 So.2d 1177 (Ala.1983); James v. State, 337 So.2d 1332, 1341 (Ala.Cr.App.1976)." Gamble v. State, 480 So.2d 38, 40 (Ala.Cr.App.1985). Even if a trial judge's statements are erroneous, "`[i]t cannot be seriously contended that every expression of opinion by the court, during the progress of the trial, ... shall furnish ground for reversal.' Lang v. State, 279 Ala. 169, 170, 182 So.2d 899 (1966)." Gamble v. State, supra, at 40. "`Remarks by the trial judge may be open to criticism, but they are not error unless they have affected the result of the trial.'" Towns v. State, 494 So.2d 798, 800 (Ala.Cr.App.1986), quoting Cox v. State, 489 So.2d 612 (Ala.Cr.App.1985). See also McCovery v. State, 365 So.2d 358 (Ala.Cr.App.1978).'
"McNeely, supra, 524 So.2d at 380."
Dooley v. State, 575 So.2d 1191, 1194 (Ala.Crim.App.1990).

*235 III.
The appellant argues that the trial court erred in denying his motion for a change of venue, because he alleges that there was adverse publicity and that that he was prejudiced by it was demonstrated through voir dire examination of potential jurors. The appellant argues that certain statements by potential jurors and testimony by various representatives of two television stations proved actual prejudice.
However, a review of the record indicates that only 13 of 70 potential jurors stated that they had heard anything about the case. These veniremembers were individually questioned concerning their exposure to this pretrial publicity. As a result, none were challenged for cause on this ground. Although two were eventually impaneled and served on the jury, their responses to the individual questioning indicates that, although they recalled having read an article that the trial was about to begin, neither could recall any details of the offense from the article and both stated that this exposure to the publicity would not affect their ability to hear the evidence and to judge the case impartially and fairly. With the exceptions of the trial court's instructions to the veniremembers to avoid any contact with any media, and a statement by the trial court indicating that an employee of one of the newspapers had been present in order to write about the trial, there was no further indication in the record of any coverage, much less pervasive coverage.
"Rule 10.1, Ala.R.Crim.P., which governs motions for a change of location of a trial, states in part:
"`(a) Grounds. In any criminal case prosecuted by indictment or on appeal for trial de novo in which a jury is demanded, the defendant shall be entitled to a change of the place of trial to the nearest county free from prejudice if a fair and impartial trial and an unbiased verdict cannot be had for any reason. The court may change the place of trial in any criminal case if trial in the original county poses a clear and present danger to the defendant from mob violence.
"`(b) Burden of Proof. The burden is upon the defendant to show to the reasonable satisfaction of the court that a fair and impartial trial and an unbiased verdict cannot be reasonably expected in the county in which the defendant is to be tried.'
"Woods presented no evidence at trial in support of this contention, aside from his motion for a change of venue. He presented no newspaper articles or other exhibits detailing the publicity around the case. This Court's only means of reviewing this contention is by evaluating the voir dire examination of the prospective jurors. We note that Woods never argued that any jurors who were not struck should have been struck because of any bias based on prejudicial pretrial publicity. In Hardy v. State, 804 So.2d 247, 293-94 (Ala.Cr.App.1999), we stated the following concerning a defendant's burden of proof when moving for a change of venue:
"`The burden of proof is on the defendant to "show to the reasonable satisfaction of the court that a fair and impartial trial and an unbiased verdict cannot be reasonably expected in the county in which the defendant is to be tried." Rule 10.1(b), Ala.R.Crim.P. Hardy failed to meet this burden. "Rather, he has simply made bare allegations that there was prejudicial pretrial publicity and that this publicity biased the jurors" and thus "did not show that he could not receive a fair trial." Hyde v. State, 778 So.2d 199 (Ala.Crim.App.1998). See also *236 Henderson v. State, 612 So.2d 1256, 1258 (Ala.Crim.App.1992) ("A bare allegation is not sufficient to prove that the defendant was actually prejudiced or that the community was so saturated with prejudicial publicity as to render the trial setting inherently suspect."); Callahan v. State, 557 So.2d at 1306 ("Having produced no evidence, Callahan failed to demonstrate any prejudice, or even that pretrial publicity actually existed, and the trial court properly denied his motion on that ground."). The trial court did not abuse its discretion in denying Hardy's motion for a change of venue.'"
Woods v. State, 789 So.2d 896, 907-08 (Ala.Crim.App.1999), aff'd, 789 So.2d 941 (Ala.2000). See also Ex parte Windsor, 683 So.2d 1042, 1046 (Ala.1996).
"In Ex parte Grayson, 479 So.2d 76 (Ala.), cert. denied, 474 U.S. 865, 106 S.Ct. 189, 88 L.Ed.2d 157 (1985), the Alabama Supreme Court stated the following regarding motions for a change of venue:
"`Absent a showing of abuse of discretion, a trial court's ruling on a motion for change of venue will not be overturned. Ex parte Magwood, 426 So.2d 929, 931 (Ala.), cert. denied, 462 U.S. 1124, 103 S.Ct. 3097, 77 L.Ed.2d 1355 (1983). In order to grant a motion for change of venue, the defendant must prove that there existed actual prejudice against the defendant or that the community was saturated with prejudicial publicity. Sheppard v. Maxwell, 384 U.S. 333, 86 S.Ct. 1507, 16 L.Ed.2d 600 (1966); Franklin v. State, 424 So.2d 1353 (Ala.Cr.App.1982). Newspaper articles or widespread publicity, without more, are insufficient to grant a motion for change of venue. Anderson v. State, 362 So.2d 1296, 1298 (Ala.Cr.App.1978). As the Supreme Court explained in Irvin v. Dowd, 366 U.S. 717, 723, 81 S.Ct. 1639, 6 L.Ed.2d 751 (1961):
"`"To hold that the mere existence of any preconceived notion as to the guilt or innocence of an accused, without more, is sufficient to rebut the presumption of a prospective juror's impartiality would be to establish an impossible standard. It is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court....:
"`The standard of fairness does not require jurors to be totally ignorant of the facts and issues involved. Murphy v. Florida, 421 U.S. 794, 799-800, 95 S.Ct. 2031, 44 L.Ed.2d 589 (1975). Thus, "[t]he proper manner for ascertaining whether adverse publicity may have biased the prospective jurors is through the voir dire examinations." Anderson v. State, 362 So.2d 1296, 1299 (Ala.Cr.App.1978).'
"479 So.2d at 80."
Jackson v. State, 791 So.2d 979, 995 (Ala.Crim.App.2000). The appellant in the present case bases his allegation of actual prejudice on the fact that there was some media coverage of the event, although the only information in the record concerning this coverage was that it apparently described the offense and the fact that the trial was upcoming, and that some of the jurors had heard something about the offense before trial. Thus, the appellant has raised bare allegations, but has produced no evidence to demonstrate any prejudice. Callahan v. State, 557 So.2d 1292, 1306 (Ala.Crim.App.), aff'd, 557 So.2d 1311 (Ala.1989), cert. denied, 498 U.S. 881, 111 S.Ct. 216, 112 L.Ed.2d 176 (1990). Therefore, there is no indication of any abuse of discretion *237 by the trial court in denying the appellant's motion for a change of venue.

IV.
The appellant alleges that the trial court erred in ordering the juvenile court to produce his juvenile court file. Specifically, the appellant states that, during the sentencing phase of his trial, the trial court gave the district attorney a copy of the appellant's juvenile adjudications and psychological history at the request of the prosecutor. He argues that the prosecutor requested this file to use the information in it "to pursue the State's case in front of the jury during the sentencing phase," which he contends is an impermissible use of the information.
However, a review of the transcript of the sentencing hearing indicates that the prosecutor's stated purpose for requesting the admission of the appellant's juvenile records specifically referred to, and included only, the psychiatric evaluation done on the appellant while he was a juvenile with pending cases. The prosecutor stated that he sought to have these juvenile records admitted to refute the psychiatric evaluation defense counsel sought to introduce, which had been prepared by a doctor who had previously evaluated the appellant when he was a juvenile. The record indicates that defense counsel sought to introduce a psychiatric evaluation of the appellant done on August 21, 1995, by a doctor who had evaluated the appellant on September 11, 1989, when the appellant was a juvenile offender; in the earlier evaluation the doctor had arrived at a different conclusion concerning the appellant's intellectual ability than he arrived at in the 1995 evaluation. Defense counsel indicated that he had no objection to the introduction of this report, but argued that the information, conclusions, and observations would have been superseded by the more recent evaluation.
Section 13A-5-45(d), Ala.Code 1975, provides as follows:
"At the sentence hearing evidence may be presented as to any matter that the Court deems relevant to sentence and shall include any matters relating the aggravating and mitigating circumstances referred to in §§ 13A-5-49, 13A-5-51 and 13A-5-52."
Defense counsel in the present case sought to introduce an evaluation that indicated that the appellant suffered from psychological and intellectual problems, in an effort to prove the mitigating circumstance enumerated in § 13A-5-51(2), i.e., that the capital murder "was committed while the defendant was under the influence of extreme mental or emotional disturbance." Furthermore, pursuant to § 13A-5-47(b), Ala.Code 1975:
"Before making the sentence determination, the trial court shall order and receive a written pre-sentence investigation report. The report shall contain the information prescribed by law or court rule for felony cases generally and any additional information specified by the trial court. No part of the report shall be kept confidential, and the parties shall have a right to respond to it and to present evidence to the court about any part of the report which is the subject of factual dispute. The report and any evidence submitted in connection with it shall be made part of the record in the case."
Thus, the appellant's juvenile reports should have been available to the parties because they contained information that was the "subject of factual dispute."
Moreover, although the record and reports did concern the appellant's activities as a juvenile, it was proper for the district attorney to acquire the records and submit *238 them to the court. Section 12-15-100(a)(4), provides:
"(a) Social, medical, and psychiatric or psychological records, including reports of preliminary inquiries and predisposition studies, of delinquent, in need of supervision and dependent children, including supervision records of such children, shall be filed separate from other files and records of the Court and shall be open to inspection and copying only by the following:
". . .
"(4) The probation and other professional staff assigned to serve a criminal court, including the prosecutor and the attorney for the defendant, for use in considering the sentence to be imposed upon a convicted person, or one adjudicated a youthful offender, who, prior thereto, had been a party to the proceedings in court...."
The appellant's suggestion that the district attorney had improper uses for the information in the appellant's juvenile records is not supported by the record, and the district attorney used the information concerning the prior psychiatric evaluation as permitted. Therefore, there was no error on this ground.

V.
The appellant argues that the trial court indicated a bias against the appellant by making inconsistent rulings on hearsay objections; the appellant argues that by denying defense counsel's hearsay objection and sustaining the State's objection on the same ground, the trial court showed "a preference for the State's case." The record indicates that the appellant failed to raise any claim of judicial bias or impartiality during the trial; therefore, any such claim must be analyzed pursuant to the plain-error rule. Rule 45A, Ala.R.App.P. Although the appellant's failure to object on this ground does not preclude review, any claim of prejudice he now makes on appeal must be weighed against him because of his failure to object. Kuenzel v. State, 577 So.2d 474 (Ala.Crim.App.1990), aff'd, 577 So.2d 531 (Ala.), cert. denied, 502 U.S. 886, 112 S.Ct. 242, 116 L.Ed.2d 197 (1991).
Moreover, a review of the record concerning the two objections indicates that, although both objections occurred during the testimony of the same witness, the subject matter of the witness's testimony when the two objections were made and the basis of each objection were different. During the direct examination of this State's witness, the prosecutor was eliciting testimony concerning an occurrence approximately two weeks before the murder. The witness testified that the victim and she were in the car and that they were going to get the victim's clothes, because at that time she was still living with the appellant. The witness testified that, as they drove, the victim told her that the appellant had "tied her up," and had put a piece of plastic over her face and choked her. The witness further testified that the victim told her that she had had a warrant issued against him, but that she had not gone to court to testify. The prosecutor then asked the witness why the victim had not gone to court on that occasion. Defense counsel objected, stating, "[I]f she knows. We are getting into very rank hearsay." The trial court overruled the objection, but repeated defense counsel's instruction for the witness to answer "[i]f she knows." The prosecutor then repeated his question as to why the victim did not go to court and asked whether the victim had told the witness what had prevented her from going to court. Defense counsel again objected, and the trial court overruled the objection. The prosecutor *239 stated, "[I]t goes to his intent, once again." The witness responded that the victim had told her that "she was tied up." The witness testified that, although the case was dismissed when the victim did not go to court, it was reinstated after the victim again called the authorities. She further testified that, on the day she and the victim were going to get her clothes, the appellant began following them in his vehicle and eventually hit the witness's car, causing her to stop. He then attempted to pull the victim out of the vehicle, but the witness held onto her and prevented him from doing so. He fled.
Subsequently, during the cross-examination of this witness, defense counsel was attempting to elicit testimony indicating that the victim was seeing other men. Defense counsel referred to the fight between the appellant and another man, Joe Norwood, earlier on the night of the murder, and indicated that, following the fight, the appellant had asked the victim if she "wanted" the other man. The witness responded that the appellant had not asked that question, but rather had asked, "[I]s this what you want?" Defense counsel then stated, "[S]o if Sharion Walker testifies that he said that, he asked Tracy if she wanted Joe, then that's incorrect?" The prosecutor objected on grounds that the question called for a mental conclusion on the part of the witness as to what another person, who had not yet testified, could or could not say. He further stated, "She [the witness] can't read the mind of other people." The trial court then sustained the objection. Defense counsel stated that he would rephrase the question, and he asked, "Did Bobby ask Tracy if she wanted Joe?" To which the witness responded, "He said, `Is that what you want.'"
As to the prosecutor's objection, the appellant clearly suffered no prejudice: he was allowed to rephrase the question and elicit an answer from the witness. Moreover, his original question was improperit called for a conclusion, surmise or guess on the part of the witness. "A witness may not testify to the uncommunicated intent or mental operation of another." Perry v. Brakefield, 534 So.2d 602, 608 (Ala.1988) (holding as improper the question to a witness calling for an opinion or conclusion as to how another party knew certain facts and why a letter was received by yet another person). "A witness should not be allowed to state that another person does or does not know a particular fact, this being a mere conclusion." Louisville & N.R.R. v. Williams, 183 Ala. 138, 145, 62 So. 679 (1913). See also Cargall v. Riley, 209 Ala. 183, 95 So. 821 (1923) (witness's testimony "that the defendant did not discover my car standing in the middle of the street until he was within 20 or 25 feet of the same" was improper as being a mere surmise or guess of the witness); Reliance Life Ins. Co. v. Russell, 208 Ala. 559, 94 So. 748 (1922) (the bracketed portion of the question, "you had authority to do it [and they knew you were doing it]?" was held improper as requesting a conclusion of the witness); Southern Ry. Co. v. Haynes, 186 Ala. 60, 65 So. 339 (1914) (the trial court properly refused to allow the defendant to show that his agent knew nothing of any ill feeling between the plaintiff and a third party in an action by a passenger for an assault).
Defense counsel's objections to the testimony of the State's witness concerning statements the deceased made to her regarding earlier acts of violence by the appellant should have been sustained; this testimony constituted hearsay.
"`A statement made by the victim of a crime is ordinarily hearsay and inadmissible, unless it constitutes a recognized exception such as res gestae, a dying *240 declaration, a threat, a declaration as to state of mind made by a victim upon his departure to meet the defendant, or a complaint in connection with a sex crime.' C. Torcia Wharton's Criminal Evidence, § 260 (14th ed.) `Statements and declarations of a deceased are not competent evidence for or against an accused in a murder prosecution unless made in his presence, or unless they are admitted in evidence as part of the res gestae or constitute dying declarations.' Lovett v. State, 491 So.2d 1034 (Ala.Cr.App.), cert. denied, 491 So.2d 1039 (1986) (quoting from Hargrove v. State, 368 So.2d 335, 337 (Ala.Cr.App.1979)). See also Holland v. State, 162 Ala. 5, 50 So. 215 (1909)."
Jones v. State, 570 So.2d 775, 778 (Ala.Crim.App.1990). Thus, in Laney v. State, 643 So.2d 1024 (Ala.Crim.App.1994), the testimony of a friend of the murder victim as to statements the victim allegedly made indicating that the defendant had previously assaulted her were held to be hearsay. In James v. State, 723 So.2d 776 (Ala.Crim.App.1998), the defendant objected at trial to the introduction of police reports as constituting inadmissible hearsay because they contained "factual information" and were being introduced to prove the truth of the matter therein; specifically, he argued, they were being introduced to show that the defendant had threatened or harassed the murder victim in the month before she was killed. This Court held that the reports constituted inadmissible hearsay and that they were not an exception as business record because it was not fact of the reports themselves that was being placed before the jury, but rather the complaints made by the victim concerning the defendant's prior abuse. In Jones v. State, supra, the State sought to introduce testimony concerning statements made by the murder victim to his mother and sister several hours before the offense, and argued that those statements were admissible as exceptions to the hearsay rule because they were part of the res gestae of the offense. However, this Court determined that the testimony constituted inadmissible hearsay because it did not serve to explain or to lucidate the offense and because the statements were "narratives of past transactions ... [,] lacking in spontaneity." Id. at 779.
However, even though the testimony in the present case by a State's witness, a friend of the victim, constituted inadmissible hearsay, the conviction need not be reversed if the error was harmless.
"The standard for determining whether constitutional error is harmless is whether the court can `declare a belief that it was harmless beyond a reasonable doubt.' Chapman v. California, 386 U.S. 18, 24, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967). In determining whether constitutional hearsay error is harmless, a court may consider numerous facts, including
"`"the importance of the [declarant's] testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the [declarant] on material points, ... in the overall strength of the prosecution's case." Delaware v. Van Arsdall, 475 U.S. [673], 684, 106 S.Ct. 1431, 889 L.Ed.2d 674 [(1986)].'
"James v. State, 723 So.2d 776, 781 (Ala.Crim.App.), cert. denied, 723 So.2d 786 (Ala.1998)."
Ex parte Dunaway, 746 So.2d 1042, 1050 (Ala.1999) (Lyons, Justice, concurring in the judgment and concurring in part and dissenting in part as to the rationale). In Ex parte Dunaway, the Alabama Supreme Court, in its majority opinion determined *241 that the testimony of a State's witness during sentencingthat the victim stated that the defendant had previously threatened to kill her and the other victimwas held admissible as "[a] statement of the declarant's then existing emotions or state of mind [which] has historically been admissible as an exception to the hearsay evidence rule. See McElroy's Alabama Evidence, supra, § 261.03(2) and (5); Ex parte Whisenhant, 555 So.2d 235 (Ala.1989) (statement of fear, including statement as to the cause of the fear, held admissible); and Jackson v. State, 629 So.2d 748 (Ala.Crim.App.1993) (same)." 746 So.2d. at 1048. In a special writing, Justice Lyons stated his belief that the testimony constituted "hearsay within hearsay," id. at 1049, but error in its admission was harmless because the State had presented "ample admissible evidence indicating that [the defendant] intended to kill [the victims] and because the State presented other evidence indicating that this capital murder was especially heinous, atrocious, or cruel...." In another separate opinion concurring in part, concurring in the result in part, and dissenting in part, Justice Johnstone noted that the testimony constituted hearsay, but that its admission did not constitute plain error because it was not sufficiently prejudicial; it was cumulative of the testimony of the same witnesses as to observations they had made of the defendant's conduct as he had menaced and threatened the victim. "Testimony that may be inadmissible may be rendered harmless by prior or subsequent lawful testimony to the same effect or from which the same facts can be inferred. McFarley v. State, 608 So.2d 430, 433 (Ala.Crim.App.1992); Thompson v. State, 527 So.2d 777, 780 (Ala.Crim.App.1988)." Travis v. State, 776 So.2d 819, 861 (Ala.Crim.App.1997) (any error in admitting police officers' hearsay testimony, which was related to the shoot-out with the defendant, held to be harmless because the same facts came into evidence through the officers' description of the facts that had occurred during the offense; furthermore, any error in admitting a State's alleged hearsay testimony that the defendant had been present in the house when the sheriff had arrived was harmless, because the sheriff and deputy had also testified to this fact.) See also Smith v. State, 795 So.2d 788 (Ala.Crim.App.2000) (even if the statement of the defendant's mother that he washed his clothes in her trailer constituted hearsay, any error was harmless as the statement was cumulative of other evidence presented through the defendant's own admissions to the police). Thus, in Ex parte Bryars, 456 So.2d 1136, 1139 (Ala.1984), the Court determined that hearsay testimony concerning the deceased's statements as to threats made against him by the defendant was inadmissible and was not harmless as testimony was not "cumulative on the question of motive, except as to other inadmissible evidence." "Viewed in its totality, there is simply no way to dismiss the inadmissible evidence ... as harmless or cumulative. The bulk of the state's testimony about the incident and about the alleged disagreement came not from eyewitness accounts but from hearsay statements." Id.
"A denial of the right of confrontation may, in some circumstances, result in harmless error. Delaware v. Van Arsdall, 475 U.S. 673, 680-84, 106 S.Ct. 1431, 89 L.Ed.2d 674 (1986). The correct inquiry to use in determining whether the error in this case was harmless was set out by the United States Supreme Court in Chapman v. California, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967). In that case, the Supreme Court stated:
"`In fashioning a harmless-constitutional-error rule, we must recognize *242 that harmless-error rules can work very unfair and mischievous results when, for example, highly important and persuasive evidence or argument, though legally forbidden, finds its way into a trial in which the question of guilt or innocence is a close one.
"`... We prefer the approach of this Court in deciding what was harmless error in our recent case of Fahy v. Connecticut, 375 U.S. 85, 84 S.Ct. 229, 11 L.Ed.2d 171 [(1963)]. There we said: "The question is whether there is a reasonable possibility that the evidence complained of might have contributed to the conviction." Id., at 86-87, 84 S.Ct. at 230.... Certainly error, constitutional error, in illegally admitted highly prejudicial evidence or comments, cast on someone other than the person prejudiced by it a burden to show that it was harmless. It is for that reason that the original common-law harmless-error rule put the burden on the beneficiary of the error to prove that there was not injury or to suffer a reversal of his erroneously obtained judgment. There is little, if any, difference between our statement in Fahy v. State of Connecticut about "whether there is a reasonable possibility that the evidence complained of did not contribute to the conviction" and requiring the beneficiary of a constitutional error to prove beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained. We, therefore, do no more than adhere to the meaning of our Fahy case when we hold, as we now do, that before a federal constitutional error can be held harmless the Court must be able to declare a belief that it was harmless beyond a reasonable doubt. While appellate courts do not ordinarily have the original task of applying such a test, it is a familiar standard to all courts, and we believe its adoption will provide a more workable standard....'
"Chapman v. California, 386 U.S. at 23-24, 87 S.Ct. at 827-28 (footnotes omitted.) This harmless error standard has been applied in hearsay cases. United States v. Cruz, 765 F.2d 1020, 1025 (11th Cir.1985).
"There are numerous factors which can be considered in assessing harmless error, including `the importance of the [declarant's] testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the [declarant] on material points, ... and the overall strength of the prosecution's case.' Delaware v. Van Arsdall, 475 U.S. at 684, 106 S.Ct. 1431, 89 L.Ed.2d 674."
James v. State, 723 So.2d 776, 781-82 (Ala.Crim.App.1998). In James v. State, supra, this Court held that the admission of the inadmissible hearsay evidence was not harmless error, despite the strong case and subsequent evidence of the appellant's guilt presented by the State, because the Court found a reasonable possibility that the hearsay evidence contributed to the conviction.
In the present case, the testimony concerning the appellant's prior abuse of the victim was harmless error because several police officers testified to the number of calls they made in response to allegations of domestic abuse by the appellant against the deceased. Moreover, the officer who arrested the appellant when he had placed the plastic bag over the victim's head during an earlier instance of domestic abuse, testified concerning the fact that the case was dismissed because the victim failed to appear for trial and the fact that the case was later reinstated by the victim. He testified that he was a witness in a trial *243 involving a case against the appellant brought by the victim. Cf. James v. State, supra at 780. (The police officers who testified concerning the police reports could not vouch for the credibility of the victim and "none made an additional investigation to try and prove the complaints; and none took a sworn statement form the complainants. None of the officers were aware whether a warrant was ever made out against James as a result of the complaints.")
In the present case, it is clear that at least one of the officers pursued a case against the appellant charging him with domestic abuse, arrested him based on what he had observed at the scene, and went to trial to testify against him. Moreover, another officer testified that when he took a report as to an instance of domestic violence by the appellant against the victim, the appellant was present when the victim described what had occurred.[2] There was also evidence that the appellant had been convicted of assault in the third degree and of menacing for his prior abuse of the victim. Moreover, there was eyewitness testimony from the State's witness, as to whose testimony defense counsel had raised the present hearsay challenge, that she had been present with the victim in an automobile when the appellant had pursued them, had rammed his car into their car, and had attempted to drag the victim out of the automobile. The witness testified that the whole time the appellant was screaming at the victim and the victim was screaming for help.
The inadmissibility of hearsay evidence is based on the fact that it is not considered as reliable as in-court testimony because the declarant is not present to testify and cannot be cross-examined concerning the statement.
"`[W]hen a hearsay declarant is not present for cross-examination at trial, the Confrontation Clause normally requires a showing that he is unavailable. Even then, his statement is admissible only if it bears adequate "indicia of reliability." Reliability can be inferred without more in a case where the evidence falls within a firmly rooted hearsay exception. In other cases, the evidence must be excluded, at least absent a showing of particularized guarantees of trustworthiness.'"
Bush v. State, 695 So.2d 70, 126-27 (Ala.Crim.App.1995), aff'd, 695 So.2d 138 (Ala.1997), quoting Rouse v. State, 548 So.2d 643, 645-46 (Ala.Crim.App.1989), quoting, in turn, Ohio v. Roberts, 448 U.S. 56, 65-66, 100 S.Ct. 2531, 65 L.Ed.2d 597 (1980) (footnotes omitted). "[T]he requirements of the Confrontation Clause are met if [the] testimony is marked with such trustworthiness that there is no material departure from the reason of the general rule, and if it bears indicia of reliability that would afford the trier of fact a satisfactory basis for evaluating the truth of the ... statement." Id. at 127, 100 S.Ct. 2531. In the present case, hearsay testimony concerning the prior instances of domestic abuse is given a guarantee of trustworthiness and an indicia of reliability through the eyewitness testimony of the police officers concerning the victim's physical injuries after the earlier assault, the prior convictions of the appellant for third-degree assault and menacing as to the victim, and the eyewitness testimony of the State's witness concerning the appellant's actions in ramming her automobile and attempting to drag the victim out of the car. "The hearsay rule is based upon the idea that out-of-court statements are to be *244 excluded because they are unreliable and untrustworthy. Consequently, some statements have been admitted as exceptions upon the ground that the proponent was able to show safeguards which ensured or indicated the reliability and trustworthiness of the statement." C. Gamble, McElroy's Alabama Evidence § 242.01(2) (5th ed.1996), citing Jackson v. State, 471 So.2d 516 (Ala.Crim.App.1985); Dallas County v. Commercial Union Assur. Co., 286 F.2d 388 (5th Cir.1961). In the present case, there was sufficient other evidence to supply the requisite trustworthiness and reliability to this hearsay testimony; therefore, its admission constituted harmless error.

VI.
The appellant argues that the admission into evidence of "oversized, grossly inflammatory, and highly prejudicial photographs" during the prosecutor's opening statements and during the trial violated his rights to a fair trial, a fair sentencing proceeding, and his rights under State law and the United States Constitution. The record indicates that the appellant had filed a pretrial motion, seeking to exclude photographic evidence of the victim's condition following the offense; that motion was denied. He also renewed this motion immediately before trial, based on the State's enlargement of three of the photographs, and because of the photographs' alleged inflammatory effect on the jury. The prosecutor responded to the appellant's motion as follows:
"[Prosecutor]: [The photographs] are offered to show intent, Judge, as well as the injuries [the victim] had, and location of the wounds. As well as one of the photographs shows the victim in the car. The defense has had copies of these. Whether they are blown up or not, they are the same color photographs. As far as being glossy, I have a rightthere are cases that say. Now, I have no problem with a sticker for some human dignity covering up some appropriate parts, Judge. I would agree to that. I think it's important to show the evidence of the wounds, that they are alleging that Baker didn't mean to kill her. He says that in one of the statements he gave to Fred Fellows. He shot the lady five times, and blew her to pieces is what he did. I think it's important for the jury to see the location of the wounds, the position where they are, and it shows the intent part of the crime. That's what they are intended for. There are plenty of cases that say they are admissible."
The trial court ruled that the photographs would be allowed into evidence.
In Duncan v. State, 827 So.2d 838 (Ala.Crim.App.1999), this Court addressed a claim that the trial court had erred in admitting into evidence an oversized photograph showing the victim's body when it was discovered. The appellant in that case argued that the size of the photograph was excessive, and that its probative value was far outweighed by the prejudice, because, he argued, its sole purpose was to inflame the jury.
"The ultimate question in determining the admissibility of a photograph of a victim, as with all demonstrative evidence, is `whether it has a reasonable tendency to prove or disprove some material fact in issue. This decision is left largely to the sound discretion of the trial judge. Of course, the decision of the trial judge is not necessarily final since his decision is reviewable to determine if there has been an abuse of discretion.' C. Gamble, McElroy's Alabama Evidence, § 207.01(2)(5th ed.1996) (footnotes omitted).
"`In Johnson v. State, 620 So.2d 679, 692 (Ala.Cr.App.1992), rev'd on *245 other grounds, 620 So.2d 709 (Ala.1993), cert. denied, 510 U.S. 905, 114 S.Ct. 285, 126 L.Ed.2d 235 (1993), the appellant argued that grossly inflammatory photographs should not have been allowed into evidence at the guilt and penalty stages of the trial. In holding that photographs were admissible at both stages, this Court stated:
"`"We have reviewed the challenged photographs and, although they are not pleasant to look at, we conclude that the trial court did not err in admitting them at either stage of the proceedings."
"`"[P]hotographs that show the external wounds of a deceased victim are admissible even though the evidence is gruesome and cumulative and relates to undisputed matters." Ex parte Siebert, 555 So.2d 780, 783 (Ala.1989), cert. denied, 497 U.S. 1032, 110 S.Ct. 3297, 111 L.Ed.2d 806 (1990). See also Ex parte Bankhead, 585 So.2d 112 (Ala.1991). "[P]hotographic evidence, if relevant, is admissible even it has a tendency to inflame the minds of the jurors." Ex parte Siebert, at 784. See also Ex parte Bankhead. We find no error in trial court's admission of the photographs at the guilt phase of the trial. See, e.g., Smith v. State, 581 So.2d 497 (Ala.Crim.App.1990), rev'd on other grounds, 581 So.2d 531 (Ala.1991) (photographs of victim's decomposed and bloated body properly admitted); Dabbs v. State, 518 So.2d 825 (Ala.Crim.App.1987) (photographs of victim's head injuries taken during autopsy were gruesome but necessary to demonstrate extent of injuries); Hamilton v. State, 492 So.2d 331 (Ala.Crim.App.1986) (photograph of deceased's exposed scalp properly admitted into evidence).'
"Boyd v. State, 715 So.2d 825, 833 (Ala.Crim.App.1997). See also George v. State, 717 So.2d 844 (Ala.Crim.App.1996); Arthur v. State, 711 So.2d 1031 (Ala.Crim.App.1996); Siler v. State, 705 So.2d 552 (Ala.Crim.App.1997). `There is irony in a convicted murderer's contending on appeal that pictures of the corpse of his victim might have inflamed the jury. That risk "comes with the territory."' Price v. State, 725 So.2d 1003, 1052, quoting Grice v. State, 527 So.2d 784, 787 (Ala.Cr.App.1988). `Perpetrators of crime that result in gruesome scenes have reason to expect that photographs of those gruesome scenes will be taken and admitted into evidence.' Jenkins v. State, 627 So.2d 1034 (Ala.Cr.App.1992), affirmed, 627 So.2d 1054 (Ala.1993), cert. denied, 511 U.S. 1012, 114 S.Ct. 1388, 128 L.Ed.2d 63 (1994)."
Duncan v. State, 827 So.2d at 850-51.
Moreover, in the present case, there is no indication that these photographs distorted the victim's injuries in any way that might have misled the jury. There was testimony indicating that the photographs accurately displayed the victim's condition and her injuries, as well as her surrounding circumstances at the time of the discovery of the body and the crime scene immediately following the offense. See Bombailey v. State, 580 So.2d 41, 46 (Ala.Crim.App.1990); Lee v. State, 562 So.2d 657 (Ala.Crim.App.1989).
The photographs in question were relevant as tending to show the location and details of the offense and the injuries suffered by the victim, as well as illustrating a number of witnesses' testimonies.

VII.
The appellant argues that the trial court erred in allowing the State to produce the enlarged photographs, which had not been *246 previously given to the defense, despite prior request for their production, in violation of Rule 16.1(c), Ala.R.Crim.P. The appellant argues that he was "ambushed by the State" when the large photographs were introduced into evidence. The record clearly indicates that defense counsel acknowledged that he was given copies of all photographs the State sought to introduce at trial. Moreover, on appeal, the appellant does not contend that he was not given access to copies of the photographs; rather, he argues that he was not informed that the photographs would be enlarged.
However, Rule 16.1(c), Ala.R.Crim.P., does not require that a party divulge the size of the photograph that is to be used at trial. The purpose of the rule is to allow the defendant the opportunity to inspect, copy, photograph, or analyze the content of the evidence. There was no prejudicial error, furthermore, in the prosecutor's method of introducing this evidence. The appellant was aware of the content of the photographs, and this Court has held earlier in this opinion that the enlargement of these photographs did not result in reversible error in this case. See Part VI. Moreover, the record indicates that defense counsel objected to the admission of these enlarged photographs at trial, and that his objection was properly overruled. Therefore, there is no indication that the appellant was prejudiced by the fact that the State did not inform the appellant before the admission of the photographs that they would be enlarged.

VIII.
The appellant argues that the trial court erred by failing to grant his motion for a mistrial or a continuance to conduct a youthful offender hearing. The appellant argues in his brief to this Court that the trial court acted improperly by failing to inform him of his right to apply for youthful offender status until the trial had commenced. He further argues that, because the hearing for his youthful offender status was held after the trial had commenced, it was untimely; therefore, he says, his motion for mistrial should have been granted. He also argues that his counsel at trial was ineffective for failing to present any evidence at his youthful offender hearing.
The record indicates that, after the trial had commenced, the prosecutor informed the trial court that he believed there was a potential problem because the appellant, who was under the age of 21 years at the time of the commission of the capital offense, had not applied for youthful offender status, according to the records. The prosecutor then stated that he perceived possible problems on appeal as a result, suggesting that the appellant would file a Rule 32 petition alleging that his trial attorneys were incompetent. The trial court responded that the court file did not reflect that the appellant had filed a youthful offender application and the trial court further noted that it was unable to ascertain whether the appellant had waived his right to file for youthful offender status. The trial court then stated that it would allow the appellant to apply for youthful offender status at that time and that a hearing on the application would be held. One of defense counsel responded that, after he was appointed to represent the appellant, the possibility of applying for youthful offender status was discussed and defense counsel were informed that the appellant had been previously denied youthful offender status in another case. Defense counsel stated that he informed the appellant that, because he had previously been denied such status, that it was unlikely that it would be granted in the present case. The trial court then asked the appellant if, following his previous discussions with his attorney, he had wished *247 to waive his application. The appellant did not answer. The other defense counsel stated that he had also spoken to the appellant about applying for youthful offender status approximately one week before trial. This defense counsel, however, indicated that the appellant had not agreed to waive his application. The court then ordered that the appellant be given an application for youthful offender status and that a hearing be held on the matter. The appellant then moved for a mistrial on the ground that his application was being filed after the trial had begun. The trial court denied the motion, and the prosecutor made the following argument:
"[Prosecutor]: Judge, I think we can put on the record in response that Mr. Baker now wants a mistrial. If the youthful offender report is done and given to the Court, you have the discretion to grant Youthful Offender on all these cases. Then, we would have a mistrial, because you have that authority. So that would be my response to him wanting a mistrial now.
"I think the record should reflect that the defense lawyers ... have talked about this, and Baker, himself, did not ask [defense counsel] to come in and apply [for] YO, knowing all along a jury was struck, and we are into trial. [Defense counsel] said that they talked about it a week ago. They sat on it once again. Once again, the evidence is very clear that the capital murder conviction, without him applying for YO, this case would get reversed and sent back before the inkwe would not even ask for a review in an appellate court with that on the record, because we know what would occur."
The prosecutor then asked that defense counsel be given copies of the youthful offender reports prepared on the appellant in previous cases, and defense counsel responded they had already seen these reports. Defense counsel then stated that the appellant had indicated that he was unable to read the application so defense counsel read the form aloud to the appellant, on the record. The appellant then signed the form and the trial court stated to the appellant, "[B]y signing that form, you understood what your attorney read to you; Is that correct?" The appellant then indicated that he did not understand the form and the trial court asked him why he had signed it. The appellant responded that he did not know why he had signed the form, to which the trial court stated, "Don't play games with me." The appellant responded, "I ain't playing no games with you." The court thereafter asked the appellant what he did not understand about the proceedings and the appellant responded, "I just don't understand." A letter written by the appellant to the victim's mother was then read to the court, to show that the appellant could read and write. Defense counsel then asked that he be granted a recess to consult with the appellant in order to determine what he did not understand about the form. Just before the trial court allowed defense counsel to speak to the appellant, the prosecutor made the following statement:
"[Prosecutor]: I think we need to put something else on the record. As I understand, he applied for YO three times. He got YO from District Judge John Steensland, he was denied by a circuit judge. Once again, it's the State's contention he understands what Youthful Offender is. After they talked to him, we will bring the clerk and look at those records, so he does understand. Because he was granted one time and refused on his unlawful possession of controlled substance and a possession case, which later they dismissed the distribution. But he pled on the possession of cocaine, and he got probation. Once *248 again, he's told Cathy Long his probation officer, he doesn't have any significant problems of any kind. Her records show that out. And they gave that to the defense."
After returning from recess, the prosecutor made a statement to the court indicating his belief that defense counsel were attempting to invite error by failing to apply for youthful offender or to waive that right prior to trial. Defense counsel responded as follows:
"[Defense counsel]: Thank you, Judge. Approximately a week ago Bobby Baker in the Houston County Jail did ask me, as I remember verbatim his question to me, he said, `Hey, what about Youthful Offender?' And I said, `You've already been denied Youthful Offender.' He says, `does that mean I can't get it?' And I said, `in this Circuit, that's pretty much what that means.' And he says, `but I want you to apply for it anyway.' And I said, `Okay. We will.' And, Judge, I had not thought about it since then. And that's the truth. Now, that is the gospel truth."
Defense counsel then stated that he had consulted with the appellant and that the appellant had again indicated that he did not understand the youthful offender form, adding "and that's all I can tell you." He stated that the appellant acknowledged that he understood it to be a form but that he did not understand what the form did. The trial court responded that, because the appellant did not understand the form, the court believed that it would be in the best interests of the appellant to proceed with the youthful offender hearing.
The prosecutor then offered a previous record wherein the appellant had signed the application for youthful offender, acknowledging that he had understood it and that, in fact, he had been given youthful offender status from the judge. The prosecutor noted that the appellant had thus previously been awarded youthful offender status and, after applying on another occasion, had been denied youthful offender status. The trial court then stated that "to the extent that [he had] heard evidence in this particular case and to the extent that [the parties] have gone through these proceedings, if the defense want[ed] another judge to listen to the application, that's fine with me." The prosecutor then agreed with the trial court that another judge should preside over the youthful offender hearing; however, the appellant stated that he wished the trial court to preside over his hearing. When the trial court asked the appellant why, the appellant responded, "I don't know."
The prosecutor then entered into evidence the appellant's previous applications for youthful offender status and reports in a case of assault in the third degree and menacing, both city appeals, wherein he had been granted youthful offender status. The prosecutor also introduced three circuit court cases in which he had been denied youthful offender status.[3] The appellant's probation officer testified that she had prepared the youthful offender reports on the circuit court cases. She further testified that the charges were for the unlawful possession of a controlled substance and the unlawful distribution of a controlled substance and that she had opposed youthful offender status "based on his arrest record" and the fact "that he had dropped out of high school in the ninth grade and had never been employed." She acknowledged that she had interviewed the appellant and that he had indicated that he had previously had seizures, *249 but no longer had them, and that he had never been treated for any mental or emotional problem. He also had indicated to her that he had never used alcohol or drugs. The appellant's juvenile records indicated that he had been charged with rape in the first degree, and that that charge was reduced to sexual misconduct, and that he had been charged in the unlawful possession of a controlled substance (cocaine) case, and that on that case he was released to his mother's custody. He had also been convicted of reckless driving, attempting to elude the police, and criminal mischief in the third degree, and there was a consent decree on a charge of theft of property in the third degree in juvenile court. The officer also testified that she had made the previous youthful offender report for the City of Dothan court where the appellant had been charged with carrying a concealed weapon on a district court appeal, menacing, and assault in the third degree. He was granted youthful offender status on those cases. The witness testified that the appellant was not a "good" probationer in that he reported a few times and then quit reporting. His probation was revoked for failing to report, failing to pay fees, and failing to pay his court costs and fines. She testified that, in her opinion, the appellant would not be a good candidate for youthful offender status on the three pending felony charges of capital murder, assault in the first degree, and shooting into an occupied dwelling. The trial court thereafter denied the appellant's application for youthful offender status "because of his prior record, his inability to fulfill the terms of probation, which he was given the second time."[4]

A.
The trial court's failure to inform the appellant of his right to apply for youthful offender status and its failure make a determination thereon until after the commencement of trial did not constitute reversible error. In Ex parte Petty, 548 So.2d 636 (Ala.1989), the petitioner argued that the trial court had erred in failing to inform him in a timely manner of his right to pursue youthful offender status. The Supreme Court held that, although a trial court should inform a youthful defendant of such rights before the plea stage, the error is not reversible if the trial court gives sufficient notice to the defendant before conviction, unless the defendant has entered a plea of guilty without any notice of the act or can show that he was prejudiced by the court's delay. In so holding, the Alabama Supreme Court wrote:
"We recognize that proceedings under the Alabama Youthful Offender Act are substantially different from ordinary adult criminal proceedings. In Baldwin v. State, 456 So.2d 117, 123 (Ala.Crim.App.1983), aff'd, Ex parte Baldwin, 456 So.2d 129 (Ala.1984), the Court of Criminal Appeals stated:
"`In Alabama, the proceedings under the Youthful Offender Act are not criminal in nature and are used to protect persons in a specified age group, who would otherwise be tried as adults, from the harsh consequences of the criminal adjudicatory process. Raines v. State, 294 Ala. 360, 317 So.2d 559 (1975).
"`"The Youthful Offender Act is intended to extricate persons below twenty-one years of age from the harshness of criminal prosecution and conviction. It is designed to provide them with the benefits of an informal, confidential, rehabilitative *250 system. A determination that one is a youthful offender (1) does not disqualify the youth from public office or disqualify the youth from public employment, (2) does not operate as a forfeiture of any right or privilege, (3) does not make him ineligible to receive any license granted by public authority, and (4) shall not be deemed a conviction of crime; and (5) the record shall not be open to public inspection except upon permission of the court. Title 15, § 266(6), Code of Alabama."
"`Raines v. State, [294 Ala. at 363, 317 So.2d at 561]. See also commentary in § 15-19-1 through § 15-19-7, Code of Alabama 1975.'
"The decision to grant or deny an eligible defendant youthful offender treatment is a matter solely within the trial court's discretion. See Code 1975, § 15-19-1. However, § 15-19-1 has been interpreted to impose an affirmative duty on the court to apprise an accused youthful offender of the benefits of the Act. See Clemmons v. State, 294 Ala. 746, 750, 321 So.2d 238, 243 (1975); Robinson v. State, 429 So.2d 682, 683 (Ala.Crim.App.1983); Bledsoe v. State, 409 So.2d 924, 926 (Ala.Crim.App.1981); and Johnson v. State, 55 Ala.App. 579, 580, 317 So.2d 546, 547 (Ala.Crim.App.1975). The question now being addressed by this Court is when the trial court must advise the youthful offender of the provisions of the Act, or, stated differently, at what point in the criminal process the court has erred to reversal by reason of untimely notice of the Act.
"....
"While we certainly recognize that the trial court should inform the youthful defendant of the benefits of the Act as soon in the criminal process as practicable, we also recognize that it is not always reversible error for the trial court to fail to do so. For example, it would be unreasonable to reverse the judgment of the trial court in a case in which the defendant enters a plea of `not guilty,' without notice of the Act, but is subsequently informed of the provisions of the Act prior to conviction. Under such circumstances, the defendant has suffered no conviction under the adult criminal process, which is a primary purpose of the Act, and thus, has suffered no prejudice by his lack of information. On the other hand, in a case in which the youthful defendant enters a plea of `guilty,' without notice of the Act, any subsequent notice by the court would be ineffective. Thus, the defendant, in such a case, would be entitled to withdraw his former `guilty' plea and proceed with his application for youthful offender treatment.
"We hold, then, that while a trial court should inform a youthful defendant of the provisions of the Youthful Offender Act prior to the plea stage, its failure to do so will not constitute reversible error if the court gives adequate notice prior to conviction, unless, of course, the defendant entered a plea of `guilty' to the charges against him, without notice of the Act, or he can otherwise show that he has been prejudiced by the court's delay."
Ex parte Petty, supra, at 637-38. (Footnotes omitted.)
In Lochli v. State, 565 So.2d 294 (Ala.Crim.App.1990), an appellant who had pleaded guilty filed a motion seeking to amend his sentence because in one of the prior convictions used for enhancement he had not been advised of his right to apply for youthful offender treatment. In that case, the trial judge allowed the appellant to "retroactively apply youthful offender treatment in the [previous] burglary case *251 and denied that application after a consideration of [his] situation as it [had] existed in [the previous case.]" Lochli v. State, supra, at 297. This Court held that the trial court's retroactive consideration cured any prejudice that might have resulted from the failure to inform the defendant of that right previous to the earlier convictions that had been used to enhance his present sentence. See also Gordon v. Nagle, 647 So.2d 91 (Ala.1994).
In the present case, it is clear that before the proceedings the appellant had notice of his right to treatment as a youthful offender and that he was given a hearing, although untimely, concerning the possibility of such treatment so that the trial court retroactively cured the error. The appellant has demonstrated no prejudice due to the untimeliness of this hearing.
Therefore, the appellant's motion for a mistrial based on this ground was likewise properly denied. "A mistrial is a drastic remedy that should be used sparingly and only to prevent manifest injustice. Ex parte Thomas, 625 So.2d 1156 (Ala.1993)." Hammonds v. State, 777 So.2d 750, 767 (Ala.Crim.App.1999). "`A motion for a mistrial implies a miscarriage of justice and is such a serious matter that it should be granted only when there is a fundamental error in the trial which would vitiate the result. Montgomery v. State, 446 So.2d 697, 702 (Ala.Cr.App.1983), cert. denied, 469 U.S. 916, 105 S.Ct. 291, 83 L.Ed.2d 227 (1984).'" Gamble v. State, 791 So.2d 409, 437-38 (Ala.Crim.App.2000).

B.
Defense counsel in the present case were not ineffective for failing to present any evidence at the youthful offender hearing or for failing to timely file an application for youthful offender treatment. The record concerning the hearing on the appellant's motion for youthful offender treatment indicates that defense counsel cross-examined the appellant's probation officer and introduced into evidence a recent psychological evaluation of the appellant to determine whether the information in that report might affect the witness's conclusions regarding the appellant. Specifically, the witness was questioned as to whether the report's findings that the appellant had a low IQ and was functionally illiterate might affect the witness's opinion that the appellant dropped out of school at ninth grade, without reason, and failed to comply with the conditions of his probation. In light of the circumstances discussed just before the appellant's hearing, as noted earlier, there is no indication that defense counsel's assistance was ineffective. See Cauley v. State, 681 So.2d 1105, 1106-07 (Ala.Crim.App.1996). Moreover, as previously determined in Part VIII.A., because the untimeliness of the appellant's youthful offender application and hearing was not reversible error, the appellant suffered no prejudice due to his counsel's failure to pursue this matter prior to his entry of his plea. Thomas v. State, 511 So.2d 248, 255 (Ala.Crim.App.1987), Strickland v. Washington, 466 U.S. 668, 587, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).

IX.
The appellant argues that the trial court erred in failing to grant a mistrial based on four separate motions raised by defense counsel. The appellant first argues that his motion for a mistrial should have been granted based on the untimeliness of his application for youthful offender status and the hearing on that application; this matter has been previously fully discussed. See Part VIII. The appellant also argues that his motion for a mistrial should have been granted because of his absence from the courtroom when a witness was present *252 to testify; specifically, when the appellant was allowed a restroom break while a witness was sworn and waited on the stand, without testifying, until the appellant returned to the courtroom; this issue has previously been determined adversely to the appellant. See Part II.
The appellant also argues that his motion for a mistrial should have been granted because a State's witness was present for a large amount of testimony by another State's witness, after "the rule" had been invoked. The record indicates that, during the testimony of a firearms and toolmark expert for the State, defense counsel approached the bench and informed the trial court that another witness was seated in the back of the courtroom and requested that "he be removed." The prosecutor stated that the witness seated in the back of the courtroom was not being called by the State, and defense counsel stated that he did, however, intend to call the witness and considered him to be a hostile witness. Following the testimony of the firearms expert, the trial judge stated:
"THE COURT: Let the record reflect, too, it may not be very clear that when [defense counsel] approached me [a] while ago about a witness being in the courtroom, I really didn't state on the record exactly the action I took. But I did have that particular witness removed and sent to the, I believe, the defense witness room."
Following this statement, defense counsel made a motion for a mistrial based on the appellant's absence from the courtroom when the State's firearms witness had been seated on the witness stand. There is no indication in the record that the appellant ever moved for mistrial based on the presence of the potential witness in the courtroom. Therefore, any error on this ground must amount to plain error, pursuant to Rule 45A, Ala.R.App.P.
"The general rule is that excluding witnesses upon invocation of `the Rule' is a matter largely left to the trial court's discretion, and its decision on the matter will not be disturbed unless it amounts to an abuse of discretion. Christiansen v. Hall, 567 So.2d 1338 (Ala.1990)." Faulkner v. Walters, 661 So.2d 227, 230 (Ala.1995).
"`That the conduct of the witness caused or could have caused any injury to defendant is highly speculative, but whether so or not, the action of the trial court was well within its discretionary province....' Boyd v. State, 51 Ala.App. 324, 327, 285 So.2d 134, 137 (1973) cert. denied, 291 Ala. 773, 285 So.2d 138 (Ala.1973).
"`When a witness disobeys an order excluding him from the courtroom during the examination of witnesses, the better practice, where there has been no misconduct of the party calling him, is to admit his testimony, and punish him for contempt. Bell v. State, 44 Ala. 393. It is discretionary with the trial court to permit a witness placed under the rule, but who violates it, to testify. Sanders v. State, 105 Ala. 4, 8, 16 So. 935; Hall v. State, 137 Ala. [44], 47, 34 So. 680; Wilson v. State, 52 Ala. 299'
"Moulton v. State, 19 Ala.App. 446, 449, 98 So. 709, cert. denied, 210 Ala. 656, 98 So. 715 (1923). See also Dotson v. State, 49 Ala.App. 37, 268 So.2d 503, 505 (1972).
"Furthermore, in Goodman v. State, 52 Ala.App. 265, 291 So.2d 358, 363 (1974), the trial court permitted three deputy sheriffs who were witnesses in the case to remain in the courtroom for security purposes, although the rule had been invoked. This court stated:

*253 "`Exclusion of some witnesses and not others is entirely a matter of discretion with the trial court, and this discretion is not reviewable.... Defranze v. State, 46 Ala.App. 283, 241 So.2d 125; Nichols v. State, 267 Ala. 217, 100 So.2d 750; Elrod v. State, 281 Ala. 331, 202 So.2d 539.'
"291 So.2d at 363-64."
Johnson v. State, 648 So.2d 629, 634 (Ala.Crim.App.1994).
In the present case, the witness who remained in the courtroom was a witness for the defense rather than for the State. Joe Norwood, who had remained in the courtroom during the testimony of the State's firearms expert, had been involved in an earlier altercation with the appellant on the day of the offense. During the trial, the appellant insinuated that Joe Norwood and the victim had been having an affair. Moreover, the appellant argued that he was acting out of anger over this perceived affair when he fought Norwood and subsequently kidnapped and killed the victim. The firearms expert's testimony was not related to the testimony to be given by witness for the defense who remained in the courtroom. Thus, there is no indication that the appellant suffered any prejudice from this violation of the rule. Moreover, this matter is best suited for determination by the trial court within the wide discretion it is permitted, and there is no indication that the court abused this discretion. Thus, there is no plain error as a result of Norwood's subsequent testimony.

X.
The appellant argues that the trial court erred in failing to grant his strike for cause of a juror who was related to a supervisory official of Dothan emergency 911 dispatch, because, he argues, the dispatcher had an important role in the investigation and the prosecution, and in gathering evidence in the present case. The record indicates that during voir dire one of the potential jurors stated that her daughter-in-law was a supervisor of the Dothan emergency 911 program. The appellant challenged the potential juror for cause, stating:
"[Defense counsel]: ... Your Honor, we would move to challenge for cause [the potential juror] whose daughter is the supervisor over the Dothan E 911 Communications Dispatchers. And [prosecutor] has indicated to the Court that that is going to be a very integral part of this case. In fact, we are going to be taking the jury down, according to [the prosecutor], to the Communications office, so that the E 911 tape can be played. And her daughter is the supervisor. She said that her daughter was one of the operators or dispatchers down there. And we think that that was very good reason for her to be challenged for cause in this case."
The prosecutor responded that the daughter was not the person who took the 911 call in the present case and noted that defense counsel failed to ask the potential witness whether this relationship would prevent her from giving the appellant a fair trial. Defense counsel stated that, because parties were disputing who made certain statements on the tape, the potential juror could be influenced by the fact of her daughter's employment. The prosecutor again responded that the daughter was not being called to testify. The trial court then denied the challenge. Subsequently, the potential juror was individually questioned concerning her relationship with the 911 supervisor. The potential juror noted that the supervisor was her daughter-in-law rather than her daughter and, when asked whether her daughter-in-law's role as supervisor would influence her in any *254 way in favor of the State, she responded that it would not. She was then asked by defense counsel whether she would tend to believe the dispatcher's testimony more because the dispatcher works for her daughter-in-law. The potential juror again responded negatively. The trial court again denied the challenge.
"The test for determining whether a strike rises to the level of a challenge for cause is `whether a juror can set aside their opinions and try the case fairly and impartially, according to the law and evidence.' Marshall v. State, 598 So.2d 14, 16 (Ala.Cr.App.1991). `Broad discretion is vested with the trial court in determining whether or not to sustain challenges for cause.' Ex parte Nettles, 435 So.2d 151, 153 (Ala.1983). `The decision of the trial court "on such questions is entitled to great weight and will not be interfered with unless clearly erroneous, equivalent to an abuse of discretion."' Nettles, 435 So.2d at 153."
Dunning v. State, 659 So.2d 995, 997 (Ala.Crim.App.1994).
In the present case, the potential juror was not directly related to a witness in the case. Moreover, the potential juror stated that her daughter-in-law's employment would not affect her ability to serve as an impartial juror. See Scott v. State, 473 So.2d 1167, 1174 (Ala.Crim.App.1985) (the appellant argued that a juror should have been excused for cause, pursuant to § 12-16-150(4), Ala.Code 1975, because she was related to one of the witnesses; however, the juror indicated that she would not give great weight to her relative's testimony and, therefore, there was no error). Thus, in the present case, there was no error by the trial court in denying the appellant's challenge for cause of this potential juror.

XI.
The appellant alleges that the trial court erred in denying his motion made pursuant to Batson v. Kentucky, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986). Specifically, the appellant objects to the peremptory strikes of two black veniremembers by the prosecution. The record indicates that there were 70 members of the venire and that 12 of these members were black. Following the challenges for cause, two black veniremembers remained. Both of these veniremembers were struck by the prosecutor. The appellant made a Batson motion, alleging discrimination by the State in striking these two black jurors, and specifically, arguing as follows:
"[Defense counsel]: ... During voir dire questioning, [a black male veniremember] did respond that he had a murderer in his family. He had a brother that shot a brother. But he did not testify or give any responses relative to being adverse to the State's position in a capital murder charge or, for that matter, in any matter.
"[The other potential black male juror], a black male, responded that his father was a police officer and gave no responses that could reasonably be construed as being biased against the State in this case. Yet, both of them were struck by the State. Specifically, [the latter of these potential jurors] testified he owned a weapon, an SKS 7.62 .39mm assault rifle. And that certainly wouldn't be adverse or hostile to the State's position.
"... Also [the latter potential juror] testified that he knows one of the Assistant D.A.'s Durrell Whiddon. And I believe he's testified that he's used him before as a lawyer. I cannot find in my notes or in my memory any responses, that would even remotely suggest that [these *255 potential black jurors] would be jurors that would be biased against the State."
Defense counsel then stated that the prosecutor clearly exercised the strikes based on the fact that the potential jurors were black and noted that there was no black juror on the jury panel or serving as an alternate. The trial court did not determine that the appellant had presented a prima facie case of discrimination; however, the prosecutor gave the following reasons for these two strikes:
"[Prosecutor]: Judge, first of all, yesterday at the close of the voir dire you instructed the jurors to be back at 8:30. You gave them directions, told them to come to your courtroom. In this very courtroom this morning at 8:30, we came in, the clerk started calling the roll. [The latter of the two potential black jurors] was twenty minutes late. He was not in this courtroom. He did not follow your instructions. I think it's very important for any juror, very simply, to follow directions of the Court. He did not do that. He was the only juror out of the entire panel that didn't follow your instructions and show back up in Court. That's the reason I struck him.
"Second, let's go to [the other potential black juror]. He testified that a brother killed a brother, that it would be very difficult for him to sit on this case. That's the reason I struck him. I have no other jurors whose brother killed another brother. Those are the two reasons both of those jurors were struck."
Thereafter, the trial court denied the appellant's motion.
The prosecutor presented a valid race-neutral reason for the striking of the first potential black juror, based on his desire not to be involved in a capital murder case because his brother had previously shot and killed another of his brothers. The record indicates that the potential juror indicated that because he had "been a victim of violence of this sort," it would "put [him] in a position to compromise the proceedings, because [he understood] how the victims may have felt." The potential juror further stated, "I have been on both [sides] of this fence and I don't want to ride it again." This Court has previously held that where a prosecutor exercises his strike against a juror on grounds that the potential juror was connected with criminal activity or related to someone related to criminal activity, the reason was race-neutral.
"A connection with or a founded suspicion of criminal activity can constitute a sufficiently race-neutral reason for the exercise of a peremptory strike. Stephens v. State, 580 So.2d 11 (Ala.Crim.App.1990), aff'd, 580 So.2d 26 (Ala.1991); Powell v. State, 548 So.2d 590 (Ala.Crim.App.1988), aff'd on other grounds, 548 So.2d 605 (Ala.1989); Lynn v. State, 543 So.2d 704 (Ala.Cr.App.1987), aff'd, 543 So.2d 709 (Ala.1988), cert. denied, 493 U.S. 945, 110 S.Ct. 351, 107 L.Ed.2d 338 (1989). This connection with or suspicion of criminal activity includes the juror in question, as well as close relatives and friends of the juror. Stephens; Allen v. State, 555 So.2d 1185 (Ala.Crim.App.1989); Lynn."
Heard v. State, 584 So.2d 556, 560 (Ala.Crim.App.1991). "Also, striking a juror who has indicated his desire not to serve is a reason that does not violate Batson. Lewis v. State, 659 So.2d 183 (Ala.Cr.App.1994); Stephens v. State, 580 So.2d 11 (Ala.Cr.App.1990), aff'd, 580 So.2d 26 (Ala.), cert. denied, 502 U.S. 859, 112 S.Ct. 176, 116 L.Ed.2d 138 (1991)." Hall v. State, 820 So.2d 113, 129 (Ala.Crim.App.1999). See also Council v. State, 682 So.2d 495 (Ala.Crim.App.1996) (a number of jurors were struck for race-neutral reasons *256 based on the potential jurors' statements that they did not wish to serve on the jury).
The prosecutor also came forward with a race-neutral reason for having struck the other potential black juror who failed to return to the courtroom as instructed by the trial court. The record indicates that the trial court had to send someone to look for this potential juror when he did not return as instructed and that he did not appear in the courtroom until at least 20 minutes after the assigned time. All of the other veniremembers had returned to the courtroom as instructed. Such a reason has been held to be race-neutral. See Scott v. State, 599 So.2d 1222 (Ala.Crim.App.), cert. denied, 599 So.2d 1229 (Ala.1992), citing United States v. Mathews, 803 F.2d 325, 331 (7th Cir.1986), rev'd on another ground, 485 U.S. 58, 108 S.Ct. 883, 99 L.Ed.2d 54 (1988) ("veniremember `had demonstrated a pointed disinterest in the proceedings evidenced not only by her tardiness but also by her posture and demeanor.'") 500 So.2d at 1229. See also Robinson v. State, 560 So.2d 1130, 1133 (Ala.Crim.App.1989) (district attorney's reason for striking a black veniremember because he was tardy on two days when the circuit clerk called the roll was held to be sufficiently race-neutral).
Defense counsel in the present case maintained that the reasons for striking these jurors must have been racial, despite the reasons given by the prosecutor; however, defense counsel failed to provide any specific claim that the reasons were pretextual. Bush v. State, 695 So.2d 70, 96 (Ala.Crim.App.1995), aff'd, 695 So.2d 138 (Ala.1997). The trial court's determination that the prosecutor provided race-neutral reasons for his strikes and that he was not motivated by intentional discrimination was not clearly erroneous. Ex parte Branch, 526 So.2d 609, 625-26 (Ala.1987).

XII.
The appellant argues that the trial court erred in allowing the admission of evidence of prior bad acts in order to prove the appellant's intent. This Court has previously addressed the admissibility of the appellant's prior bad acts despite an objection on the grounds of hearsay. See Part V. The appellant also argues that these prior bad acts were inadmissible because they were admitted improperly to prove his intent to kill the victim and had limited probative value. In response to the defense's motion in limine, the prosecutor made the following proffer of the evidence he sought to prove, through testimony of police officers and other witnesses, that the appellant had "struck, hit, beat, injured Tracy Baker, his wife, as to going to show his intent":
"On 11-17-93 Police Officer Albert Riley talked to Tracy Baker, and thathe said that she indicated that Bobby Baker got mad at her because she was talking on the phone, and he hit her in the left eye with his fist and hit her with the phone. He observed her left eye was swollen.
"On 12-12 of '93 Police Officer Bryan Smith reported at 913 Houston Street, Bobby and Tracy were at the Waffle House and got into an argument. And Bobby hit her with his fist around the temple area on the left side and her face was swollen.
"On January 25, 1994 Police Officer Andy Martin went to 803 Appletree where Sara Odom lived and saw Tracy. That Bobby had hit Tracy in the left eye with his fist, and her left eye was swollen on that occasion.
"On February 11th, 1994 Adrian Woodruff, a police officer here in Dothan, *257 would testify she went to the RCC Citgo Station on Highway 84E and Ross Clark Circle. Bobby Baker was going to get duct tape and tie her up. She jumped into the truck with a stranger and wouldn't get out until the police arrived.
"On March 17, 1994, once again, Officer Albert Riley, it happened at 913 Houston Street reported by Darlene Riggins that Tracy was tied up by Bobby Baker with an extension cord, and placed a plastic bag over her face. And we have also got from the city of Dothan where she had signed a warrant against him for assault or menacing or reckless endangerment. I don't have it in front of me, but I'll have it where she was to appear in Municipal Court to testify. He kidnapped her on that occasion and kept her tied up where she couldn't go to Court. And the city Judge dismissed it and threw it out, since she didn't appear. But after she got loose, she contacted them and the case was reinstated because he had kept her from coming to court where she could testify against him in that case.
"On March 22, 1994 Police Officer Kevin McKee will testify, as well as other witnesses, that Bobby Baker was chasing her in a car and hit Darlene Riggins' car, whose [sic] she was in at that time, chasing her, trying to get her out of the car, trying to drag her out of the car at the time. And he left the scene after running into Darlene Riggins, trying to talk to her. And this was the occasion when she had left him and didn't want nothing to do with him."
In making his motion in limine, defense counsel first objected on the grounds of hearsay and then stated:
"[E]ven if they [the prior bad acts] were not hearsay, they have no probative value. There is no common plan, scheme, or design alleged here. Identity isn't an issue. We are not saying somebody else did these acts. So identity is not an issue. It really can come in under no exception to the general exclusionary rule."
The prosecutor then argued that the State sought to introduce these collateral acts under the motive and intent exceptions to the exclusionary rule. The prosecutor then stated that "[t]his is only offered for the limited purpose only as to his intent as to the kidnapping and killing, intentional killing of her that he did on this occasion on the capital case." Defense counsel responded that the acts were not sufficiently similar to go to intent. Defense counsel further argued that if, however, the trial court were to allow evidence of the collateral acts, there should be a limiting instruction that the evidence would be considered only as to the question of intent to terrorize and the intent to kill. The trial court thereafter denied the motion in limine holding that the acts were sufficiently similar and that they occurred "within a relatively [short] period [of] time close to when this alleged crime took place.... The first event was seven months before this crime occurred." The trial court held that the collateral acts were not too remote and that evidence of those acts was admissible in order to prove intent or motive.
"Under the general exclusionary rule, evidence of collateral offenses of the accused is inadmissible to prove guilt on the now charged offense. Anonymous v. State, 507 So.2d 972, 973 (Ala.1987). However, evidence of collateral offenses may be admissible under certain exceptions to the exclusionary rule or for `other purposes' than to prove the accused's guilt. These exceptions or other purposes include motive, intent, identity, or common plan, design, or scheme. Bowden v. State, 538 So.2d 1226, 1227 (Ala. *258 1988); Atkisson v. State, 640 So.2d 33 (Ala.Crim.App.1993); Register v. State, 640 So.2d 3 (Ala.Crim.App.1993)."
Williamson v. State, 629 So.2d 777, 780 (Ala.Crim.App.1993).
In the present case, evidence of the collateral offenses by the appellant was admissible pursuant to the motive and intent exceptions to the general exclusionary rule.
"`Evidence which pertains to an accused's motive or intent to commit the presently-charge[d] offense is admissible as an exception to the general exclusionary rule applying to collateral acts or offenses. Nelson v. State, 511 So.2d 225, 236 (Ala.Cr.App.1986), aff'd, 511 So.2d 248 (Ala.1987), cert. denied, 486 U.S. 1017, 108 S.Ct. 1755, 100 L.Ed.2d 217 (1988); Dyess v. State, 418 So.2d 208 (Ala.Cr.App.1982); Terry v. State, 397 So.2d 217 (Ala.Cr.App.), writ denied, Ex parte Terry, 397 So.2d 223 (Ala.1981). See also C. Gamble, McElroy's Alabama Evidence, § 69.01(7) (3rd [ed.] 1977). "Moreover, if the accused's commission of another crime is admissible in a present prosecution, the State may prove in meticulous detail the manner in which the accused committed such other crime." (Citations omitted). Nelson, supra, at 234.'
"Coleman v. State, 552 So.2d 156, 158 (Ala.Cr.App.1988). See also Karr v. State, 491 So.2d 1073, 1075 (Ala.Cr.App.1986)."
Hunt v. State, 642 So.2d 999, 1041 (Ala.Cr.App.1993), aff'd, 642 So.2d 1060 (Ala.1994).
The collateral offenses committed by the appellant were relevant in the present offense; they demonstrated a history of domestic abuse by the appellant against the victim and were therefore relevant in proving motive. Moreover, in the present case, the appellant alleged that he did not intend to kill the victim making the question of intent an issue.
"Domestic abuse often has a history highly relevant to the truth-finding process. When an accused has a close relationship with the victim, prior aggression, threats or abusive treatment of the same victim by the same perpetrator are admissible when offered on relevant issues under [state law]. Their rationale for admissibility is that an accused's past conduct in a familial context tends to explain later interactions between the same persons....
"Other courts have also held admissible prior abusive behavior against the same victim by the same defendant in a domestic relationship. See People v. Linkenauger, 32 Cal.App.4th 1603, 1612-13, 38 Cal.Rptr.2d 868, 873-74 (Cal.Ct.App.1995) (under California's equivalent to Rule 404(b), evidence of prior domestic quarrels, jealousy, and threats admissible to show defendant's motive, intent, and state of mind); Lindsey v. State, 135 Ga.App. 122, 218 S.E.2d 30, 31 (1975) (prior attempts to commit same crime against same victim generally admissible); State v. Gibbons, 256 Kan. 951, 889 P.2d 772, 780 (1995) (evidence of earlier spousal abuse admissible to show motive or intent, the parties' relationship, the continuing course of conduct, and corroboration); State v. Elvin, 481 N.W.2d 571, 575 (Minn.Ct.App.1992) (evidence of prior domestic violence admissible to show relationship between victim and defendant), review denied (1992); State v. Johnson, 73 Ohio Misc.2d 1, 657 N.E.2d 383, 384 (1994) (defendant's earlier convictions for crimes of violence against same victim admissible in domestic violence threat case to prove element of crime charged and intent, motive, or absence of mistake or accident)."
*259 State v. Laible, 594 N.W.2d 328, 335 (S.D.1999) (citations omitted in first paragraph). See also State v. Grant, 83 Wash.App. 98, 920 P.2d 609 (1996) (defendant's history of domestic violence was relevant and, therefore, admissible in a case involving another alleged act of domestic violence toward the same victim because it was relevant and its probative value outweighed its prejudicial effect). State v. Andrich, 943 S.W.2d 841, 845 (Mo.App.1997) (evidence of prior bad acts were admissible in a case involving the violation of an "adult-abuse" order as the evidence showed the defendant's intent to inflict injury on the victim, stating that "[i]n adult abuse cases, a defendant's history of threatening and violent conduct involving the same victim can be especially probative"). In State v. Jacobs, 939 S.W.2d 7 (Mo.App.1997), a defendant was charged with kidnapping the woman with whom he had had a five-year relationship and their child. At trial, the State introduced photographs showing prior abuse by the defendant against the victim, as well as the testimony of the victim concerning prior acts of domestic abuse by the defendant, including an incident in which he had fractured her rib, as well as one in which he had beaten the victim with his fists, a broomstick, and a television stand, and had choked her with the television cable. The Missouri Court of Appeals held that the trial court properly allowed the evidence of abuse because the evidence was logically and legally relevantit tended to establish the appellant's guilt of the charged offense and showed his animosity toward the victim, showed his intent, and showed his motive to injure her.
"The evidence of prior domestic abuse tended to establish his intent and motive to commit the crimes charged. See State v. Dooley, 851 S.W.2d 683, 688 (Mo.App.1993) (where evidence of violence in [a] relationship with [the] victim tended to establish [the] defendant's motive to commit [the] crimes of kidnapping and assault). The probative value of this evidence outweighed its prejudicial effect."
Id., 939 S.W.2d at 10. See also People v. Hines, 690 N.Y.S.2d 66, 260 A.D.2d 646 (1999) (victim was properly allowed to testify to prior domestic incidents with the defendant in a case involving reckless endangerment and criminal mischief for the burning of her clothes and the building in which she lived, in that the prior bad acts established the defendant's motive; any prejudice in the admission of this evidence was outweighed by its probative value).
In the present case, the appellant's intent was at issuehe argued that he did not intend to kill the victim. The appellant argued that he was acting out of extreme anger because the victim had a relationship with another man. In State v. Hamilton, 747 So.2d 164, 169 (La.Ct.App.1999), the defendant was convicted of two counts of first-degree murder for intentionally killing his estranged wife. On appeal, the defendant argued that his conviction should be mitigated to manslaughter, because he argued that he had killed his estranged wife in the heat of sudden passion or heat of blood. He alleged that he had found his wife, partially unclothed, and that she had just engaged in sexual intercourse with her boyfriend. He argued that this incident provoked the shootings. However, the Louisiana Court of Appeals determined that the evidence concerning the defendant's acts leading to the shooting established that he planned to commit a criminal act when he forcibly entered her home. The Court held that "[n]either the Defendant seeing his estranged wife with a boyfriend, nor disputes between spouses over their impending divorce or overdue money payments are sufficient provocation to reduce first degree murder to manslaughter." Id. (citations omitted). See *260 also State v. Haskins, 573 N.W.2d 39 (Iowa Ct.App.1997) (testimony that the defendant had grabbed his wife's hair and beat her head against a car on a prior occasion was properly admitted in a prosecution for attempted murder, domestic abuse, and reckless use of a firearm; this evidence was relevant to the issue of the defendant's intent and to rebut his defense that the shooting was accidental). Cf. People v. Knight, 309 Ill.App.3d 224, 242 Ill.Dec. 842, 722 N.E.2d 331 (1999) (the testimony concerning the defendant's statement to the victim, after she had been assaulted, indicating that he would break her legs and kill her if she slept with another of his friends was inadmissible in a domestic-abuse case; it did not go to show the defendant's intent to abuse the victim because the defendant had not argued that he had injured the victim by mistake, but rather argued that he was not present when the victim had been beaten).
In State v. Smotherman, 993 S.W.2d 525 (Mo.App.1999), evidence that the defendant had physically abused his wife twice a year during their 26-year marriage was admissible in a case of first-degree felony assault and armed criminal action, which occurred after the defendant had broken into his wife's home and shot her. The Court held that the evidence was relevant as the appellant had placed his motive and intent at issue by testifying that he had gone to his wife's house to talk to her about allowing him to see their children. He claimed that his reason for having a gun on that occasion was to shoot himself if he could not work out a visitation arrangement with his wife. He further claimed that he fired the gun at his wife because she fired at him first. The Court held that, although the evidence of the prior domestic abuses by the defendant covered a period of 26 years, the earlier acts were not too remote to be admitted into evidence. "`Whether evidence is too remote to be material is largely a matter of discretion for the trial court.' ... Additionally, `[r]emoteness of time goes to the weight of the testimony, not to its admissibility.'" Id., 993 S.W.2d at 528. (citations omitted). See also Hayes v. State, 717 So.2d 30, 37 (Ala.Crim.App.1997) ("[T]he remoteness of a collateral act generally goes to the weight and credibility of the evidence, not to its admissibility). Howell v. State, 627 So.2d 1134, 1138 (Ala.Cr.App.1993) (quoting Palmer v. State, 401 So.2d 266, 269 (Ala.Cr.App.1981), cert. denied, 455 U.S. 922, 102 S.Ct. 1280, 71 L.Ed.2d 463 (1982))."
In the present case, the trial court did not abuse its discretion in determining that the evidence concerning the prior bad acts of domestic abuse by the appellant against the victim were admissible; they tended to prove the appellant's motive and intent, both of which were at issue, and the probative value outweighed any prejudicial effect caused by the admission of such evidence.

XIII.
The appellant argues that he was unable to receive a fair trial after he had allegedly been paraded in front on the jury in handcuffs and shackles, escorted by a large number of deputies. However, the record is silent as to any occasion where the appellant walked in front of the jury in handcuffs and shackles surrounded by deputies. No objection as to this matter appears in the record and no reference to its having occurred appears in the record.
"[A]s we previously said, `where the appellant fails to include pertinent portions of the proceedings in the record on appeal, this court may not presume a fact not shown by the record and make it a ground for reversal.' Carden [v. State, 621 So.2d 342, 345 (Ala.Cr.App.1992)]. It is the appellant's duty to provide this *261 court with a complete record on appeal, and we will not predicate error on a silent record. See Wilson v. State, 727 So.2d 869 (Ala.Cr.App.1998). `"Where the record is silent on appeal, it will be presumed that what ought to have been done was not only done but was rightly done."' Jordan v. City of Huntsville, 667 So.2d 153, 156 (Ala.Cr.App.1995), quoting Stegall v. State, 628 So.2d 1006, 1009 (Ala.Cr.App.1993)."
Gamble v. State, 791 So.2d 409, 419-20 (Ala.Crim.App.2000). See also Rutledge v. State, 745 So.2d 912, 919 (Ala.Crim.App. 1999).
We have found no plain error concerning this matter. Moreover, "`[i]t is not ground for mistrial that the accused appeared before the jury in handcuffs when his appearance was only a part of going to and from the courtroom.'" Justo v. State, 568 So.2d 312, 318 (Ala.Crim.App. 1990), quoting Cushing v. State, 455 So.2d 119, 121 (Ala.Crim.App.1984).

XIV.
The appellant argues that the State failed to prove a prima facie case of shooting into a dwelling, which was occupied by Sharion D. Walker, because the evidence at trial indicated that the Sharion Walker was outside the dwelling at the time the defendant allegedly shot into the home. The appellant specifically refers to the victim's testimony that she was in the carport and holding the glass door to open it to enter the home when the rifle bullet nearly struck her.
In Sotto v. State, 701 So.2d 309 (Ala. Crim.App.1997), the appellants argued that the State failed to prove that they shot into an occupied dwelling, because the appellants argued that they shot only at the front porch, which they alleged is not part of the "dwelling"; and therefore, because no bullet actually entered the house, they argued that they did not shoot "into" an occupied dwelling. In rejecting the appellant's argument, this Court stated as follows:
"This Court in Hawkins v. State, 621 So.2d 400 (Ala.Cr.App.1993), addressed a similar issue under § 13A-11-61, Code of Alabama 1975, with respect to an occupied vehicle.
"`The appellant initially argues that he should not have been convicted of discharging a firearm into an occupied vehicle because, he says, the shots did not enter the interior of the automobile.
"`Section 13A-11-61(a) states:
"`"No person shall shoot or discharge a firearm explosive or other weapon which discharges a dangerous projectile into any occupied or unoccupied dwelling or building or railroad locomotive or railroad car, aircraft, automobile, truck or water craft in this State."
"`An "automobile" is defined as follows:
"`"A passenger vehicle designed for operation on ordinary roads and typically having four wheels and a gasoline or diesel internal-combustion engine."
"`The Random House Dictionary of the English Language (2d ed.1987).
"`The definition of an automobile includes the frame of the vehicle and the tires. Had the legislature intended to limit the application of the statute to the passenger compartment of an automobile, it would have specifically done so in the statute. Section 13A-11-61 seeks to punish all individuals who shoot into an occupied or unoccupied vehicle, whether the projectile enters the passenger compartment or not and no matter how accurate *262 their aim in firing weapons may be.'
'621 So.2d at 401 (emphasis added [in Sotto]).
"Section 13A-11-61(a) states, in part: `No person shall shoot or discharge a firearm ... into any occupied or unoccupied dwelling.' It follows that it does not matter if the projectile enters the passenger compartment of an automobile, the same is true as to a dwelling and the living area therein. If the legislature had intended that to sustain a conviction under § 13A-11-61(a) the projectile entered the actual interior of the dwelling it would have specifically stated [that requirement] in the statute. Therefore, by analogy, the state's evidence need not show the bullet penetrated the actual interior of the dwelling, but only that the shots were fired at and hit the dwelling.
"There was sufficient evidence for the trial court to submit the case to the jury and for the jury to find beyond a reasonable doubt that the appellants were guilty of firing into an occupied dwelling."
Id., at 311-12.
In the present case, Sharion D. Walker was shot by the appellant as she was in her carport entering her dwelling. Her two children and Tracy Baker were inside the dwelling when the appellant fired the shots, hitting the door beside Walker and shattering the glass in the storm door; the bullet and traveled through the wooden door and down an inside hallway. There was evidence that the bullet broke into two pieces, making grooves in the wall, one piece lodging in the living room wall and the other in the front door. This evidence was sufficient to support the charge against the appellant that he shot or discharged a rifle into an occupied dwelling, i.e., the residence of Sharion D. Walker, while the residence was occupied. Cf. 52 ALR 2d 1458 (1957) (the extent of the premises that may be defended without retreat under the right of self-defense includes a dwelling's curtilage).

XV.
The appellant argues that the State failed to prove beyond a reasonable doubt that the appellant intended to terrorize the victim during the kidnapping. The appellant argues that, in order to convict him of kidnapping, the State was required to prove two intents: the intent to prevent the victim's liberation and the intent to kill the victim when he kidnapped her. He argues that because he presented testimony that his behavior was confused and erratic and because he made statements that he was not going to kill anyone, the State failed to prove that he intended to kill the victim.
However, the offense of kidnapping does not require that the perpetrator intend to kill the victim. Pursuant to § 13A-6-43, Ala.Code 1975, kidnapping in the first degree requires that the perpetrator abduct another person with the intent to hold him for ransom or reward, use him as a shield or hostage, accomplish or aid in the commission of any felony or escape therefrom, inflict physical injury upon the victim or violate or abuse him or her sexually, terrorize him or a third person, or interfere with the performance of any governmental or political function. In the present case, the appellant was charged with kidnapping the victim by abducting her with the intent to terrorize her. In the Commentary to § 13A-6-43, which defines the offense of kidnapping in the first degree, the six purposes for abducting the victim set forth in the Code section are explained. The intent to "terrorize" the victim or a third person is described as "an *263 abduction accompanied by threats of torture, death, or other severely frightening experience." The commentary further notes:
"Death does not aggravate the crime of kidnapping as such, because any death caused during any one of the six kinds of kidnapping in the first degree is murder under the code's `felony-murder' rule. Section 13A-6-2(a)(3). Moreover, an intentional killing of the kidnapped victim is a type of aggravated murder for which the death penalty or life imprisonment without parole may be imposed. Sections 13A-6-2(c), 13A-5-2(f)."
In the present case, the evidence indicated that at the time of the kidnapping the appellant was armed with a rifle, which he fired, wounding Sharion D. Walker, before demanding that the victim exit the house and come with him. He forced the victim into the car, while she called for help and screamed, "He's going to kill me!" The appellant then drove away with the victim in the car and, when they stopped, the victim held onto the front seat, refusing to get out of the car, crying that he would kill her if she did. There was also evidence that the victim stated, "I ain't going to get out of the car. If you are going to kill me you are going to have to do it in the car." The appellant then fired five rounds into the victim's body. This evidence was sufficient from which the jury could reasonably infer that the appellant intended to abduct the victim and intended to terrorize her. See Guess v. State, 507 So.2d 546, 547-48 (Ala.Crim. App.1986), aff'd, 507 So.2d 551 (Ala.1987).

XVI.
The appellant argues that the trial court erred in not allowing the jury to hear the written jury instructions which he submitted concerning the lesser-included offense of murder with an extreme indifference to human life. The appellant also argues that the trial court erred in failing to give the defense's request for jury instructions as to: heat-of-passion manslaughter, intoxication, felony murder, reckless murder, reckless manslaughter, presumption of innocence, burden of proof, reasonable doubt, "suspicion," and "indictments." Following the trial court's instructions to the jury, defense counsel objected to the trial court's failure to charge the jury on intoxication and reckless manslaughter as counsel had requested, and the trial court agreed to give the instruction. Defense counsel further objected to the trial court's refusal to complete a requested instruction, apparently referring to the trial court's refusal to continue with a jury instruction upon reaching the phrase "moral certainty," as that concept was improper when applied to the reasonable doubt standard. The appellant made no further objections as to any of the instructions; therefore, the other alleged errors must be analyzed pursuant to the plain-error rule. Rule 45A, Ala.R.App.P. Moreover, while the appellant alleges that the trial court erred in failing to give his requested charges on these points of law, he makes no argument as to any specific prejudice.
The record indicates that the trial court gave the jury instructions, which were taken from the Alabama Pattern Jury Instructions, as to the purposes and uses of indictment, presumption of innocence, the burden of proof, the reasonable doubt standard, the weighing of evidence including circumstantial evidence, and the weight to be accorded an expert witness's testimony.
"A trial court's following of an accepted pattern jury instruction weighs heavily against any finding of plain error." Price v. State, 725 So.2d 1003, 1058 (Ala. *264 Crim.App.1997), aff'd, 725 So.2d 1063 (Ala. 1998), cert. denied, 526 U.S. 1133, 119 S.Ct. 1809, 143 L.Ed.2d 1012 (1999). The appellant has failed to demonstrate how the trial court's instructions, based on these pattern jury instructions, substantially impaired his rights. Simmons v. State, 797 So.2d 1134 (Ala.Crim.App.2000). "The failure to give a proposed jury instruction constitutes reversible error only if such instruction (1) was correct, (2) was not substantially covered by the court's charge, and (3) concerned a point in the trial which was so important that the failure to give the instruction seriously impaired the defendant's ability to defend himself. United States v. Sans, 731 F.2d 1521, 1529-30 (11th Cir.1984), cert. denied, 469 U.S. 1111, 105 S.Ct. 791, 83 L.Ed.2d 785 (1985); Connolly [v. State, 602 So.2d 443 (Ala.Cr.App.1990).]" Dill v. State, 600 So.2d 343, 353-54 (Ala.Crim.App.1991), aff'd, 600 So.2d 372 (Ala.1992), cert. denied, 507 U.S. 924, 113 S.Ct. 1293, 122 L.Ed.2d 684 (1993). In the present case, the trial court substantially covered the requested charges and properly instructed the jury on these points of law.
The record also indicates that the trial court gave the jury instructions as to intoxication and reckless manslaughter after defense counsel objected to the trial court's failure to give his requested charges on these matters. Therefore, as to these charges, the appellant suffered no prejudice because the trial court in fact charged the jury on intoxication and reckless manslaughter.
The appellant argues that the trial court should have given his requested charge as to reckless murder or murder committed with an extreme indifference to human life and felony murder because, he argues, the appellant did not have the intent to commit murder, only to commit the underlying felony.
"`[I]t is well settled that "[a] defendant is entitled to a charge on a lesser included offense if there is any reasonable theory from the evidence that would support the position." Ex parte Oliver, 518 So.2d 705, 706 (Ala.1987). Accord, Chavers v. State, 361 So.2d 1106, 1107 (Ala.1978).'" Moore v. State, 647 So.2d 43, 44 (Ala.Crim.App.1994), quoting Starks v. State, 594 So.2d 187, 195 (Ala. Crim.App.1991). However, a trial court need not charge a jury according to any conceivable theory of evidence where there is no rational basis for a verdict convicting a defendant of that offense.
"In Brown v. State, 623 So.2d 416 (Ala.Cr.App.1993), this Court stated:
"`It was not necessary here to charge on every conceivable lesser included offense, down to discharging a firearm. The jury was given the choice of finding the appellant guilty of capital murder, guilty of felony murder, or not guilty of any crime. The jury convicted him of capital murder. Therefore, we must logically conclude that instruction on ... [a lesser included offense], although proper, would not have affected the outcome of this case. Ex parte Jordan, 486 So.2d 485, 489 (Ala.1986). Thus, the refusal to instruct on any other lesser included offense was, at the worst, merely harmless error. Rule 45, Ala.R.App.P. See also Phelps v. State, 435 So.2d 158 (Ala.Cr.App. 1983).'
"623 So.2d at 420.
"`A trial judge ... may refuse to charge on a lesser included offense when it is clear to the judicial mind that there is no evidence to support such a charge. Mullis v. State, 545 So.2d 205, 212 (Ala.Crim.App.1989); Gurganus v. State, 520 So.2d 170 (Ala. Crim.App.1987). A court should not *265 charge the jury on a lesser included offense "unless there is a rational basis for a verdict convicting the defendant of the included offense." Ala. Code 1975, § 13A-1-9(b).'
"Dill v. State, 600 So.2d 343, 352 (Ala. Cr.App.1991), aff'd, 600 So.2d 372 (Ala. 1992), cert. denied, 507 U.S. 924, 113 S.Ct. 1293, 122 L.Ed.2d 684 (1993)."
Gaddy v. State, 698 So.2d 1100, 1135 (Ala. Crim.App.1996).
In the present case, the jury was given the choice of convicting the appellant of capital murder, intentional murder, heat-of-passion manslaughter, and reckless manslaughter. The jury held that the proper verdict was capital murder rather than the lesser forms of mental state and culpability. See Brown v. State, 623 So.2d 416, 420 (Ala.Cr.App.1993) ("the jury was given the choice of finding the appellant guilty of capital murder, guilty of felony murder, or not guilty of any crime. The jury convicted him of capital murder. `Therefore, we must logically conclude that an instruction on ... [lesser included offense], although proper, would not have affected the outcome of this case.' Ex parte Jordan, 486 So.2d 485, 489 (Ala. 1986).") Similarly, in Moore v. State, 647 So.2d 43 (Ala.Crim.App.1994), the appellant argued that the trial court improperly refused to instruct the jury on menacing as a lesser-included offense of discharging a firearm into an occupied vehicle. However, this Court concluded that the trial court had properly charged the jury on the crime of reckless endangerment as a lesser-included offense of discharging a firearm into an occupied dwelling. Therefore, any error was harmless because "[a]ny speculation that any jury might have found the defendant guilty of menacing had it been instructed that that offense was a lesser included offense is dissipated by the fact that the jury did not find the appellant guilty of reckless endangerment and, instead, found him guilty of the greater offense  discharging a firearm into an occupied vehicle." Id. at 46 (and cases cited therein). In the present case, although the safer practice is to charge on all lesser included offenses to murder, any error in the trial court's omission of charges as to reckless murder and felony murder was, at worse, harmless.

XVII.
The appellant argues that the district attorney's misconduct deprived him of his rights to due process, a fair trial, and a reliable sentencing determination. Specifically, the appellant argues that, during his opening argument, the prosecutor improperly referred to the appellant's violent nature and his propensity to victimize women. He further argued that the prosecutor erroneously showed a picture of the victim to the jury during his opening argument without properly identifying or authenticating it. He argues that the prosecutor commented on criminal acts that he had allegedly committed without first admitting evidence of these acts. He further argues that the prosecutor unnecessarily objected six times to defense counsel's closing argument, and that he made improper and prejudicial comments during his closing argument, e.g., statements that the appellant had previously indicated that he wanted to receive the death penalty, and that he commented on the appellant's decision not to testify. The appellant further argues that the prosecutor made a number of comments suggesting that revenge could be considered as an aggravating circumstance. Lastly, the appellant argues that the alleged acts of misconduct are cumulative and therefore incurable.[5] *266 The record indicates that the appellant failed to object at trial to any of these statements and arguments he now says were improper and prejudicial. Thus, any error must amount to plain error, Rule 45A, Ala.R.App.P., and, although the failure to object does not preclude appellate review of the issue in a capital case, it does weigh against any claim of prejudice by an appellant. Kuenzel v. State, 577 So.2d 474, 489 (Ala.Crim.App.1990), aff'd, 577 So.2d 531 (Ala.1991), cert. denied, 502 U.S. 886, 112 S.Ct. 242, 116 L.Ed.2d 197 (1991).

A.
The appellant argues that the following statement made by the prosecutor in his opening argument was improper:
"[Prosecutor] ... He got in a fight with Joe Norwood. In fact, he bit Joe Norwood where he, in fact, had to go to the hospital. But what occurred during the fight is Joe Norwood got the best of Bobby Baker, Jr. What you are going to hear from the evidence is that Bobby Baker, Jr. liked to beat on his wife. But when it came to fighting with other men, Joe Norwood, that Bobby Baker, Jr., lost that fight. He lost when it was a man and not a woman."
Following the opening arguments by counsel, many of the State's witnesses testified concerning the beatings inflicted on the victim by the appellant. There was also testimony that the appellant had engaged in a fight with Joe Norwood before the offense in which Norwood had overcome the appellant. As we have held earlier in this opinion, see Part XII, this evidence of the appellant's prior acts of domestic abuse and violence against the victim were properly admissible.
"`The purpose of an opening statement is merely to advise a jury of the issues involved in the case before them. Braswell v. State, Ala.Cr.App., 371 So.2d 992 (1979). It is a well-established rule that the scope and latitude of the opening statement are matters that rest within the sound discretion of the trial judge and his ruling should not be disturbed on appeal unless an abuse is shown. Winnings v. State, Ala.Cr.App., 370 So.2d 323, cert. denied, Ala., 370 So.2d 329 (1979).'
"Brown v. State, 401 So.2d 213, 216 (Ala. Cr.App.), cert. denied, 401 So.2d 218 (Ala.1981).
"`"The prosecution's opening statement to the jury on what it expects to prove should be confined to statements based on facts admissible in evidence. Counsel, however, is to be allowed considerable latitude in presenting to the jury in his opening statement what he expects the evidence to show." White v. State, 294 Ala. 265, 270, 314 So.2d 857, cert. denied, White v. Alabama, 423 U.S. 951, 96 S.Ct. 373, 46 L.Ed.2d 288 (1975). "`Counsel must restrict his opening statement to the issues of the case, and the theory of the case as fixed by the pleadings, and although it is ground for reversal for him to call attention to collateral matters calculated to prejudice the jury, the fact that statements proper in themselves might also produce other collateral consequences harmful to the opposite party does not, if made in good faith, *267 make the statements improper.' ... `Counsel, of course, may, in a reasonable way, outline what he expects to prove, unless it is manifest that such proof would be incompetent, or the offer or statement is made for the purpose of improperly influencing the jury.'" Daniels v. State, 243 Ala. 675, 679, 11 So.2d 756, cert. denied, Daniels v. Alabama, 319 U.S. 755, 63 S.Ct. 1168, 87 L.Ed. [1708] (1943). "`Counsel has no right, in his opening statement, to rehearse before the jury facts which he is not in a condition to prove.'" Handley v. State, 214 Ala. 172, 174, 106 So. 692 (1925). "[I]t is not contemplated that by the abuse of this privilege that an attorney will inject into the proceedings immaterial and prejudicial matter." Patterson v. State, 34 Ala.App. 359, 361, 39 So.2d 709 (1948).'
"Lawson v. State, 476 So.2d 116, 119 (Ala.Cr.App.), cert. quashed, 476 So.2d 122 (Ala.1985)."
Hunt v. State, 659 So.2d 933, 941 (Ala. Crim.App.1994), aff'd, 659 So.2d 960 (Ala. 1995).
In the present case, the prosecutor was making a statement to the jury as to what he expected to prove based on facts that were admissible in evidence. This was proper. The attorney was clearly referring to his theory of the case  that the appellant had kidnapped and murdered his wife in keeping with a pattern of domestic abuse  and was not injecting into the trial any immaterial or prejudicial matters.

B.
There was also no plain error caused by the prosecutor showing pictures of the victim, because the prosecutor explained to the jury what the State would prove through the evidence and testimony. Before trial, the trial judge had indicated that he would allow these photographs into evidence; in fact, the photographs were properly admitted during trial. See Parts VI and VII of this opinion. Thus, the displaying of the victim's photograph as the prosecutor addressed the anticipated evidence and testimony was not improper; nor was it unduly prejudicial.

C.
The appellant argues that, during defense counsel's closing arguments, the prosecutor unnecessarily objected, often without stating a ground, in order to engage in an allegedly protracted and long-winded argument to the jury. He further alleges that this improper conduct required defense counsel to object, again allowing the prosecutor to make additional arguments to the jury. A review of the record reveals the following objections made by the prosecutor during defense counsel's closing arguments to the jury:
"[Defense counsel]: ... And I'll assure you, this morning, that I'm tired and I'm under a lot of stress because I have the burden, as [other defense counsel], of representing Bobby Baker. We were appointed by the Court to represent him.
"[Prosecutor]: I object. That's irrelevant how they got the case.
"[Defense counsel]: And it is our duty 
"THE COURT: Just a minute.
"[Prosecutor]: That's just a plea for sympathy, Judge. The law is real clear 
"[Defense counsel]: Judge, I don't see where that is a plea for sympathy one way or the other.
"[Prosecutor]: Sure, it does. It's not relevant.
"THE COURT: Overruled. Go ahead.

*268 "[Defense counsel]: ... The State has charged Bobby Baker with capital murder, and as you know a capital murder case is a death penalty case. The State wants to execute 
"[Prosecutor]: Objection. That's improper at this point in the trial.
"THE COURT: Okay. Sustained.
"[Defense counsel]: The State wants to convict Bobby Baker of capital murder, which, again, is a death penalty case.
"[Prosecutor]: Objection.
"THE COURT: Okay. Sustained.
"[Prosecutor]: Ask him not to do that again, Your Honor.
"[Defense counsel]: Your Honor, I submit to the Court that this is a death penalty case.
"THE COURT: It is, but this is not the time to bring up as far as what the punishments are. That will be a later stage and the caselaw says that it is not to be considered at this point by the jury, so that's impermissible. Sustained.
"[Defense counsel]: And I would submit for the record that that could result from this.
"[Prosecutor]: Judge, I object. You just told him two times, he goes back again in front of the jury.
"THE COURT: Let's move on. You've got your objection in the record and it's not permissible, so it's sustained.
"[Defense counsel]: ... Then Bobby should be convicted and Bobby should be punished, but he shouldn't be convicted of capital murder. Now, I want to say this right now, I am truly sorry for the family of Tracy Baker.
"[Prosecutor]: I object. We don't want the defense's sympathy. It's improper for a lawyer to inject his personal feelings in a case.
"THE COURT: Okay. Sustained.
"[Defense counsel]: ... If you should find Bobby Baker guilty of capital murder, as has been said before, there will be a second trial in which you will serve as jurors. But let me tell you what I have seen in some capital murder cases.
"[Prosecutor]: Objection. It's improper for what [defense counsel] has seen things in capital murder 
"[Defense counsel]: Your Honor, I'll restate that 
"THE COURT: Okay. Sustained."
"[Defense counsel]: ... Now, if Bobby had just gone over and shot Tracy and killed her, he would not have been charged with capital murder. If Bobby had just abducted her and killed her, then he would not have been charged with capital murder.
"[Prosecutor]: Objection. That's not true. If he abducts her and kills her that's capital murder.
"[Defense Counsel]: Your Honor, can I complete?
"THE COURT: Go ahead."
"[Defense counsel]: ... Then I ask you, why didn't the State call Byron Johnson and Ezederick Eady? They were the two people who were present when Tracy was killed. Now, [prosecutor] says that they participated in this, that they knew what was going on; that they went over there to see what was  to see it happen. Now, if that's true, why didn't the State charge them with that?
"[Prosecutor]: I object.
"[Defense counsel]: Your Honor, he brought up the fact that the State had not charged them in his argument.

*269 "[Prosecutor]: No, that was in response to what he  never mind. Let him offer it. Go ahead.
"THE COURT: Go ahead.
"[Defense counsel]: If this was an abduction with intent to terrorize, then those two people participated in it, too.
"[Prosecutor]: Objection. That's not true.
"[Defense counsel]: [Prosecutor] just stood there and told them they've got to have specific intent and he's arguing, which is incorrect in the law, if he's going to say they participated, he's got to say they had specific intent in the kidnapping and abduction with the intent to kill her. Incorrect statement of law, Judge.
"THE COURT: Okay.
"[Defense counsel]: [The prosecutor] has argued that they went over there to see it happen, so he has already argued this specific intent 
"[Prosecutor]: And [defense counsel] knows that mere presence is not enough under the laws of this State to charge someone that's the law. I object.
"[Other defense counsel]: Judge, let me object, too, to the State interposing objections during closing argument. The objections are nothing more than argument. An objection is suppose to be on a point of law. What the State has objected to is simply to get in a little bit of argument and that's improper.
"THE COURT: I don't see where the State's done that. Sustained.
"[Defense counsel]: But I submit to you that this is an old trick to break-up somebody else's argument to interpose objections.
"[Prosecutor]: I object. You just sustained, that's improper, Your Honor.
"THE COURT: Okay. Let's move on. Sustained."
There is no indication in the record that the prosecutor's objections were without legitimate reasons or that the purpose of the objections was to unfairly prejudice the appellant's case by improperly interposing the State's arguments into the defense's theory of the case. "A trial court is vested with discretion in the conduct of a trial, and the appellate courts will not interfere with the exercise of that discretion unless it clearly appears that there has been an abuse of discretion. Shelton v. State, 384 So.2d 869, 870 (Ala. Cr.App.), cert. denied, 384 So.2d 871 (Ala. 1980)." Carden v. State, 621 So.2d 342, 346 (Ala.Crim.App.1992). See also Rheuark v. State, 601 So.2d 135 (Ala.Crim. App.1992). Questions regarding the conduct and propriety of argument of counsel are matters largely vested in the trial court's discretion, and the trial court is accorded broad discretion in determining what is permissible conduct and argument. Bankhead v. State, 585 So.2d 97, 105 (Ala. Crim.App.1989), remanded on other grounds, 585 So.2d 112 (Ala.1991), aff'd on return to remand, 625 So.2d 1141 (Ala. Crim.App.1992), rev'd, 625 So.2d 1146 (Ala. 1993). In the present case, there is no indication of abuse of discretion by the trial court in its rulings as to what was objectionable and permissible during defense counsel's closing argument. See State v. Richardson, 197 Wis.2d 115, 541 N.W.2d 837 (1995) (although the appellant argued that the prosecutor had interfered with his rights to a fair trial "by interrupting defense counsel three times with meritless objections during closing argument[,]... the interruptions were brief and did not deprive [the appellant] of a fair trial"). Cf., Hodge v. Commonwealth, 17 S.W.3d 824, 854 (Ky.2000) (Supreme Court found no prejudice as a result of trial judge's admonition to defense counsel to "stop objecting" after his fourth meritless objection *270 during the first seven minutes of the prosecutor's sentencing-phase closing argument because defense counsel ignored this admonition and continued to object during the remainder of the argument; moreover, the Court found no improprieties in the prosecutor's argument).

D.
The appellant argues that the prosecutor improperly referred to a letter the appellant had sent to the victim's mother concerning his role in the offense. The appellant argues that the comments by the prosecutor referring to this letter were made solely to inflame the passions of the jury and to prejudice their emotions against him. The appellant cites three occasions on which the prosecutor referred to this letter. During his opening argument, the prosecutor outlined for the jury what he expected the State's evidence to prove. As he addressed the anticipated testimony of the victim's mother, he stated that she would testify that she received at least two letters from the appellant while he was in jail. After reading a letter from the appellant to the victim's mother, he stated:
"That's what that man says right over there. At the close of the case I'm going to stand up here from the evidence I give you beyond all doubt, a hundred percent, and I'm going to ask you to do exactly what he said in that letter, what he asked for, and I'm going to ask you good citizens to give him what the evidence shows in this case. And I expect in this case you to return a verdict of capital murder...."
There was no impropriety in this statement. The prosecutor was informing the jury of what he expected the evidence to show. Moreover, during the testimony of the victim's mother, the letter was properly admitted into evidence. The prosecutor's statement indicated that he would ask the jury to return what the evidence presented by the State would prove, which was a proper argument by the prosecutor.
The appellant's second cited comment occurred during the prosecutor's closing argument, when he argued that the evidence indicated that the appellant intended to terrorize and to kill the victim. He stated:
"Then, why did he come with that assault rifle to find her, to kidnap her, to terrorize her? Because he had the intent to do exactly what he did. And to ask you good people from the witness stand from the evidence that was submitted to you in his statement that he wanted the death penalty. No ifs, ands, or buts about it. But remember, once again, I asked Sara Odom [the victim's mother]. I asked her from the witness stand from the letter that he sent from the jail. Not one letter, not two letters, but he called her, he admitted he wrote the letter and I promised you I would show you that. And I showed you by fingerprint experts that he wrote the letter.... I want you to remember his intent...."
During the State's case-in-chief, the victim's mother testified that she had received two letters from the appellant while he was in prison. Although she was unsure where one of the letters was, she testified that she had given one of the them to the district attorney's office and, after identifying the letter at trial, she read the contents of the letter to the jury. The State also presented fingerprint analysis, indicating that the appellant had handled the letter.
"`The test of a prosecutor's legitimate argument is that whatever is based on facts and evidence is within the scope of proper comment and argument. Kirkland v. State, 340 So.2d 1139 (Ala.Cr. *271 App.), cert. denied, 340 So.2d 1140 (Ala. 1977). Statements based on facts admissible in evidence are proper. Henley v. State, 361 So.2d 1148 (Ala.Cr.App.), cert. denied, 361 So.2d 1152 (Ala.1978). A prosecutor as well as defense counsel has a right to present his impressions from the evidence. He may argue every legitimate inference from the evidence and may examine, collate, sift, and treat the evidence in his own way. Williams v. State, 377 So.2d 634 (Ala.Cr.App. 1979); McQueen v. State, 355 So.2d 407 (Ala.Cr.App.1978).'"
Ballard v. State, 767 So.2d 1123, 1135 (Ala. Crim.App.1999), quoting Watson v. State, 398 So.2d 320, 328 (Ala.Crim.App.1980), writ denied, 398 So.2d 332 (Ala.1981), cert. denied, 452 U.S. 941, 101 S.Ct. 3085, 69 L.Ed.2d 955 (1981).
In the present case, the prosecutor was examining evidence admitted at trial and was presenting his impressions from this evidence. The appellant had placed the issue of intent into question by arguing that he was acting out of the heat of passion caused by the victim's relationship with another man and by presenting evidence that he may have been under the influence at the time of the offense. The prosecutor could properly argue that this letter went to negate the appellant's argument at trial that he did not intend to kill the victim. Evidence at trial indicated that his admission in the letter and act of remorse by sending the letter were typical conduct by domestic abusers following their offenses. Moreover, this conduct may negate an appellant's argument that he did not intend his actions. See Toler v. State, 623 So.2d 408, 411 (Ala.Cr.App. 1993).
Lastly, during his closing argument at the penalty phase, the prosecutor referred to an earlier argument by defense counsel. The appellant argues that the prosecutor stated, in referring to the letter the appellant wrote to the victim's mother, "[the appellant] begs for the death penalty.... He begs you." The record indicates that the statement made by the prosecutor and taken in context of his argument was as follows:
"[Defense counsel] stands here and asks you good people, haven't you, during your lifetime, you, this jury, I'm going to reply in kind. Haven't you been so mad or emotionally upset or mad that you wanted to take the gun  and he stands here and says I ... would not do this. I wouldn't shoot or kill anybody. I'll reply in kind, good people. What if it was your daughter, your goddaughter, your grandchild, if they faced someone like that monster over there, and he says, `Would you do that?' Justice in this case calls out from the evidence as he begs you for the life of Bobby Baker. He begged you."
Taken in the context of his argument, it is clear that the prosecutor's reference to "he" was an attempt to a personify justice. Thus, this argument by the prosecutor was an appeal to the jury for justice in law enforcement, and for the jury to discharge its duties according to the law and evidence. Ex parte Waldrop, 459 So.2d 959 (Ala.1984), cert. denied, 471 U.S. 1030, 105 S.Ct. 2050, 85 L.Ed.2d 323 (1985). "There is no impropriety in a prosecutor's appeal to the jury for justice and to properly perform its duty." Price v. State, 725 So.2d 1003, 1033 (Ala.Crim. App.1997), aff'd, 725 So.2d 1063 (Ala.1998).

E.
The appellant claims that the prosecutor commented on two occasions during his closing argument at the guilt phase of the trial on the appellant's decision not to testify. The first comment cited by the appellant, however, was clearly made in answer *272 to defense counsel's previous closing argument, to rebut the portion of defense counsel's argument wherein he stated:
"Why was that car close to Donnie Flournoy's house? Have you ever thought about that? The reason it was close to Donnie Flournoy's house was Bobby was on his way to take the rifle back. He didn't need it. He didn't  Of all the places in Dothan or Houston County to go to, to terrorize somebody or to kill somebody, why did he happen to wind up a short block from Donnie Flournoy's house? You can't just not answer that question. That question needs to be answered. And the reason for that is because he was going to take the rifle back.... He didn't have the intent to kill her. He didn't have the intent to terrorize her."
On rebuttal, the prosecutor responded:
"[Defense counsel] said, `This question needs to be answered, Why was Bobby Baker, Jr. taking the gun back over to Enterprise Street. He was taking it back to Donnie Flournoy's house.' Did you hear, in any manner or fashion, in any way, defense offered you any testimony about that? About he was taking the gun back to Donnie Flournoy's house. Did I miss that? They didn't do it. [Defense counsel's] fancy words do not change the facts.... Once again, we're not saying we didn't do something bad, we're not saying we did this, but it's this, this, and this all the way down to manslaughter."
These comments by the prosecutor were to rebut defense counsel's argument that the appellant did not intend to kill the victim and that his lack of intent was demonstrated by the fact that he was attempting to return the gun to its owner on the night of the offense. The prosecutor's answer to that argument was to point out that the defense produced no evidence that the defendant was attempting to return the gun. This comment was not intended to comment on the appellant's failure to testify. Ezederick Eady and Byron Johnson who were both with the appellant and both testified at trial; neither gave any testimony that the appellant was attempting to return the rifle. The owner of the rifle also gave no such testimony.
"It is clearly impermissible for a prosecutor to directly comment on a defendant's failure to testify at trial. See Griffin v. California, 380 U.S. 609, 85 S.Ct. 1229, 14 L.Ed.2d 106 (1965). However, the ... comments made by the prosecutor in his rebuttal replies to the comments made by defense counsel in his closing argument. `When the door is opened by defense counsel's argument, it swings wide, and a number of areas barred to prosecutorial comment would suddenly be subject to reply.' Davis v. State, 494 So.2d 851, 855 (Ala.Cr.App. 1986). Recently, this Court, in Stephens [v. State], 580 So.2d 11 (Ala.Crim.App. 1990), aff'd, 580 So.2d 26 (Ala.1991)[,] stated the following regarding prosecutor's statements and arguments:
"`"... `[I]t must be examined in its context and in light of what had transpired, that is, in light of preceding argument of defense counsel, to which the prosecutor's argument was an answer.' Washington v. State, 259 Ala. 104, 65 So.2d 704 (1953); Gibson v. State, 347 So.2d 576 (Ala.Crim.App. 1977); Rutledge v. State, [482 So.2d 1250] (Ala.Crim.App.1983). The rule in Alabama is that `remarks or comments of the prosecuting attorney, including those which might otherwise be improper, are not grounds for reversal when they are invited, provoked, or occasioned by accused's counsel and are in reply to or retaliation for his acts and statements.' *273 Shewbart v. State, 33 Ala.App. 195, 32 So.2d 241, cert. denied, 249 Ala. 572, 32 So.2d 244 (1947); Camper v. State, 384 So.2d 637 (Ala.Cr.App.1980); Wilder v. State, 401 So.2d 167 (Ala.1981), cert. denied, 454 U.S. 1057, 102 S.Ct. 606, 70 L.Ed.2d 595 (1981); Miller v. State, 431 So.2d 586 (Ala.Crim.App. 1983); Rutledge, supra."'
"Stephens, 580 So.2d at 21, quoting Henderson v. State, 460 So.2d 331, 333 (Ala.Cr.App.1984)."
Williams v. State, 601 So.2d 1062, 1074 (Ala.Crim.App.1991).
Taken in context, this comment did not refer to the appellant's failure to testify; it was a permissible reply-in-kind to an argument raised by the defense in his closing argument.
The appellant also cites the following comment by the prosecutor during his rebuttal closing argument, alleging that this comment also referred to his failure to testify:
"I didn't hear the defense argue or touch in anyway, didn't one time mention the assault of Sharion Walker or the shooting in a lawfully occupied dwelling house. Did you hear them argue that or talk about that at all? And they didn't, they didn't mention it. Do you know what it takes for those crimes? It takes intent, specific intent for those crimes too, ladies and gentlemen. And if he had the intent to go over there and commit those crimes and he did those, he had the intent to go in the house and start the abduction and the kidnapping of his wife, to terrorize her, to take her out, take her down to Enterprise Street and then to kill her and execute her."
Following this comment, defense counsel objected on the grounds that "[t]he intent to do one thing is not the intent to do the other." The prosecutor responded that, "I didn't say that was the case. I said he had the intent to commit two other crimes they didn't talk about. Now, I'm talking about ."
The trial court then overruled the appellant's objection "with that clarification." Thus, the discussion held during consideration of the objection indicated that the prosecutor was arguing that intent had been established as to the charged offenses of the shooting of Sharion Walker and shooting into the occupied dwelling, and that the defense had not refuted the evidence thereof. The prosecutor may comment on "the lack of evidence to refute the facts presented by the prosecution, and on the omissions in the defense's case. See Haney v. State, 603 So.2d 368, 397 (Ala.Cr.App.1991) (prosecutor's comments regarding the failure of the defense to produce certain medical records were not improper; they were legitimate comments on the evidence), aff'd, 603 So.2d 412 (1992), cert. denied, 507 U.S. 925, 113 S.Ct. 1297, 122 L.Ed.2d 687 (1993); Speigner v. State, 369 So.2d 39, 44 (Ala.Cr.App.), cert. denied, 369 So.2d 46 (Ala.1979)." Thomas v. State, 766 So.2d 860, 938 (Ala.Crim.App.2000).
"The United States Supreme Court in United States v. Robinson, 485 U.S. 25, 108 S.Ct. 864, 99 L.Ed.2d 23 (1988), narrowed the Court's holding in Griffin [v. California, 380 U.S. 609, 85 S.Ct. 1229, 14 L.Ed.2d 106 (1965)] concerning a prosecutor's comment on the defendant's failure to testify and stated the following:
"`"[T]he protective shield of the Fifth Amendment should [not] be converted into a sword that cuts back on the area of legitimate comment by the prosecutor on the weaknesses in the defense's case."
"`. . .

*274 "`"[T]he central purpose of a criminal trial is to the decide the factual question of the defendant's guilt or innocence.... To this end it is important that both the defendant and the prosecutor have the opportunity to meet fairly the evidence and arguments of one another."'
"Robinson, 108 S.Ct. at 869. (Citations omitted.)"
Williams v. State, 601 So.2d at 1074.
Moreover, in reference to both of the complained of comments by the prosecutor, each referred to a lack of evidence, evidence that could have been provided by witnesses other than the appellant. Eady and Johnson were both present during the offense; and Sharion Walker testified at trial.
"We find that, at most, the remark was an indirect comment on the failure of the appellant to testify. Thus, the question became whether the appellant alone could have provided the missing evidence. When there are other possible witnesses to refute the State's evidence, an argument that the State's case is uncontradicted does not focus the jury's attention on the defendant's failure to testify."
Bush v. State, 695 So.2d 70, 134 (Ala.Crim. App.1995).

F.
The appellant also argues that the prosecutor improperly suggested that revenge could be considered as a aggravating circumstance; however, the appellant cites to no specific statement made by the prosecutor. Moreover, the appellant did not object at trial on this ground to any comment by the prosecutor. A review of the prosecutor's closing argument reveals that his comments were inferences and impressions from the evidence. They addressed subjects which can properly be spoken to during penalty-phase argument. Thus, subjects such as remorse, or the lack of remorse, may be commented on during this argument by a prosecutor. Ex parte Loggins, 771 So.2d 1093 (Ala.2000). A prosecutor is allowed to vigorously argue his case and conclusions that can be drawn from the evidence. His appeals to the jury for justice, deterrence, and a strong criminal justice system were proper. There is no indication in the record that the prosecutor stepped beyond the wide latitude allowed to him in framing his closing argument. Thus, there was no cumulative effect of undue prejudice caused by the prosecutor's arguments to the jury.

XVIII.
The appellant argues that he received ineffective assistance of counsel at trial, because his counsel did not apply for youthful offender status until the third day of trial and because his counsel failed to strike a juror who was related to an employee of the City of Dothan's Emergency 911 program. This Court has previously discussed the merit of both alleged acts of omission substantively, see Parts I, VIII, and X of this opinion, and has determined that the appellant was not prejudiced. Nor was there error in failing to hold a hearing until the third day of trial to determine whether the appellant should be granted youthful offender status or, in allowing a juror to serve who was related to a supervisor for the Dothan Emergency 911 office. The factual basis for these claims of ineffective assistance of counsel, thus, already having been argued and addressed in this opinion, relitigation of these issues under the guise of ineffectiveness of counsel is unnecessary. Thomas v. State, 766 So.2d 860 (Ala.Crim.App.2000).
"`A finding of no manifest injustice under the "plain error" standard on *275 direct appeal serves to establish a finding of no prejudice under the test for ineffective assistance of counsel provided in Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).'
"State v. Clark, 913 S.W.2d 399, 406 (Mo.Ct.App.1996) (Footnote omitted). See also, Clemmons v. State, 785 S.W.2d 524(Mo.), cert. denied, 498 U.S. 882, 111 S.Ct. 229, 112 L.Ed.2d 183 (1990). This holding is consistent with prior Alabama caselaw. See, Thomas v. State, 766 So.2d 860 (Ala.Crim.App.1998); Hallford v. State, 629 So.2d 6 (Ala.Crim.App. 1992), cert. denied, 511 U.S. 1100, 114 S.Ct. 1870, 128 L.Ed.2d 491 (1994). As we stated in Thomas:
"`In implicitly rejecting the underlying substantive issue as failing to present any plain error, Rule 45A, Ala.R.App.P., the Alabama Supreme Court implicitly found that the alleged error did not or probably did not adversely affect the substantial right of Thomas. Thus, we must concur with the attorney general that Thomas's ineffective trial counsel argument fails, because, by virtue of the Alabama Supreme Court's implicit ruling, Thomas cannot satisfy the prejudice prong of Strickland.'
"766 So.2d at 953."
Williams v. State, 783 So.2d 108, 133 (Ala. Crim.App.2000).
In order to prove that a trial counsel was ineffective under Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), the appellant must prove both that his counsel's performance was ineffective and that he was prejudiced by this conduct so that the outcome of his trial would have been different but for the counsel's conduct. Because the substantive issues raised by the appellant have no merit, he has suffered no prejudice as the outcome would not have been different even if his counsel had used a peremptory strike to remove the particular juror from the jury panel or if counsel had timely filed an application for youthful offender status. Moreover, although the appellant makes a vague claim of ineffectiveness concerning his trial counsel's failure to renew each objection raised in his motion in limine, because this record is being reviewed pursuant to the plain-error standard and because no error occurred from the introduction of evidence concerning these collateral acts, see Parts V and XII of this opinion, the appellant also suffered no prejudice thereby.

XIX.
As required by § 13A-5-53, Ala.Code 1975, we address the propriety of the appellant's conviction and his sentence of death. The appellant was indicted and convicted of capital murder, pursuant to § 13A-5-40(a)(1), Ala.Code 1975, for intentionally murdering Tracy Baker with a gun during the course of kidnapping her with the intent to terrorize her.[6]
The record reflects that the appellant's sentence was not imposed under the influence of passion, prejudice, or any other arbitrary factor. See § 13A-5-53(b)(1), Ala.Code 1975.
A review of the record shows that the trial court correctly found the existence of four aggravating circumstances: that the capital offense was committed during a kidnapping in the first degree; that the murder was committed by a person under sentence of imprisonment; *276 that the murder was especially heinous, atrocious, or cruel when compared to other capital offenses, and that the murder was committed to disrupt or hinder the lawful exercise of any governmental function or enforcement laws. The trial court stated that its reason for finding that the capital offense was committed by a person under sentence of imprisonment was because the evidence indicated that the appellant was on probation at the time of the murder for his conviction of the unlawful possession of a controlled substance; moreover, the offense was committed to disrupt or hinder the lawful exercise of a government function or the enforcement of laws because a misdemeanor charge of assault III was pending against the appellant based on a warrant filed by the victim. This charge had been reinstated by the victim after it was dismissed because she had previously failed to appear in court because the appellant had physically prevented her from doing so.
The trial court properly addressed each statutory mitigating circumstance and stated that it particularly took into account the age of the appellant at the time of the offense  he was 20 years old  but, because of his prior extensive criminal record, the court concluded that the mitigation of age was negated; the appellant could clearly understand and appreciate the consequences of his conduct. As to the nonstatutory mitigating circumstances, the trial court considered the shortcomings in the appellant's family life during his childhood, but concluded that these problems did not rise to the level of a mitigating circumstance. The trial court further stated that it considered the evidence concerning the appellant being mildly mentally retarded and having earlier suffered from seizures; however, the trial court noted that the medical evidence was conflicting as to those matters. The trial court weighed the mitigating and aggravating circumstances and properly determined that the aggravating circumstances outweighed the statutory mitigating circumstances and nonstatutory mitigating circumstances. We agree with the trial court's findings.
As required by § 13A-5-53(b)(2), Ala.Code 1975, this Court must independently weigh the aggravating and mitigating circumstances to determine the propriety of the appellant's death sentence. After an independent weighing of those circumstances, this Court is convinced that the appellant's sentence of death is the appropriate sentence.
Pursuant to § 13A-5-53(b)(3), Ala.Code 1975, this Court must address whether the appellant's sentence was disproportionate or excessive when compared to sentences imposed in similar cases. The appellant's sentence was neither. See Stewart v. State, 730 So.2d 1203 (Ala.Crim. App.1996); Thompson v. State, 542 So.2d 1286 (Ala.Crim.App.1988), aff'd, 542 So.2d 1300 (Ala.), cert. denied, 493 U.S. 874, 110 S.Ct. 208, 107 L.Ed.2d 161 (1989); Neelley v. State, 494 So.2d 669 (Ala.Crim.App. 1985), aff'd, 494 So.2d 697 (Ala.1986), cert. denied, 480 U.S. 926, 107 S.Ct. 1389, 94 L.Ed.2d 702 (1987); Heath v. State, 455 So.2d 898 (Ala.Crim.App.1983), aff'd, 455 So.2d 905 (Ala.1984), aff'd, 474 U.S. 82, 106 S.Ct. 433, 88 L.Ed.2d 387 (1985).
We have searched the entire record for any error that might have adversely affected the appellant's substantial rights and have found none. Rule 45A, Ala.R.App.P.
The judgment of the circuit court is due to be, and it is hereby, affirmed.
AFFIRMED.
LONG, P.J., and BASCHAB and FRY, JJ., concur. COBB, J., recuses herself.
NOTES
[1] Although this order and several other documents in the record refer to this victim as "Sharon," the indictment and this victim's testimony identify her as "Sharion." Throughout this opinion, we have used the name "Sharion."
[2] Although the appellant was present when the victim made the statement, the statement nonetheless remains hearsay. See Warden v. State, 468 So.2d 203 (Ala.Crim.App.1985).
[3] The trial court's sentencing order indicates that the appellant was serving probation on his conviction for the unlawful possession of narcotics at the time of the present offense.
[4] Pursuant to the city appeal cases, after having been granted youthful offender status, the appellant was placed on unsupervised probation.
[5] The appellant also argues that it was improper for the prosecutor to comment during his opening argument on prior bad acts of the appellant, specifically, prior violent behavior by the appellant toward the victim. However, evidence of these prior acts of domestic abuse were admissible in order to prove intent and motive of the appellant, see Part XII, and, because they were properly admissible in the case-in-chief, the prosecutor could properly comment on them during his opening argument.
[6] The appellant was also convicted of assaulting Sharion D. Walker by intending to cause serious physical injury to her by means of a deadly weapon, i.e., a rifle, in violation of § 13A-6-20, Ala.Code 1975, and for discharging a firearm into an occupied dwelling, in violation of § 13A-11-61, Ala.Code 1975.